Carol JAMES, Plaintiff–Appellant,

v.

SUNRISE HOSPITAL, dba Sunrise Hospital and Medical Center and Sunrise Children's Hospital fka Humana Inc., dba Humana Hospital Sunrise, a Nevada Corporation; Does I through X, and Roes Corporations I through X, inclusive, Defendants–Appellees.

No. 93–17337.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 16, 1995.

Decided June 14, 1996.

Bruce Scott Dickinson (argued) and Anthony J. D'Olio (on the briefs), Earley & Dickinson, Las Vegas, Nevada, for defendants-appellees.

Robert E. Murdock, Murdock & Palazzo, Las Vegas, Nevada, for plaintiff-appellant.

Before GOODWIN, SNEED and KLEINFELD, Circuit Judges.

## OPINION

KLEINFELD, Circuit Judge:

Ms. James alleges that she developed an emergency medical condition while in the hospital and was discharged in violation of the federal anti-patient-dumping statute.

Her complaint was dismissed for failure to state a claim upon which relief could be granted.

### FACTS

This case was dismissed without leave to amend for failure to state a claim upon which relief could be granted under Federal Rules of Civil Procedure 12(b)(6). We therefore take the facts from the complaint and determine whether, if they could be proved, they would establish a cause of action. *National Wildlife Federation v. Espy*, 45 F.3d 1337, 1340 (9th Cir.1995).

According to the complaint, Ms. James was admitted to Sunrise Hospital with acute renal failure. While she was there, the hospital inserted a synthetic graft into her arm. The next day, she complained of pain and numbness in that forearm, wrist, and hand. Two days later, the pain and numbness had spread. Hospital personnel examined her and found that her hand was cool and beginning to turn blue. These complaints continued, and five days later, hospital personnel noted that the pulse in the arm was also weak. Nevertheless, she was discharged without any evaluation of the condition of her veins. This condition was not stabilized prior to her discharge and subsequently caused her hand to be amputated.

### ANALYSIS

We review the district court's dismissal for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) *de novo*. *Everest and Jennings v. American Motorists Ins. Co.*, 23 F.3d 226, 228 (9th Cir.1994).

Medical malpractice is a state law tort. Federal jurisdiction in this federal question case could not be and was not based upon a claim of medical malpractice. This claim is for liability under 42 U.S.C. § 1395dd(c), the Emergency Medical Treatment and Active Labor Act, commonly known as the Patient Anti–Dumping Act.[1]

---

1. To help specialists in the field, who perform computer searches by acronyms, we note that the statute is at times called EMTALA (the Emergen- cy Medical Treatment and Active Labor Act), and at times the anti-patient-dumping provisions of COBRA (the Consolidated Omnibus Budget Rec-

Congress promulgated that law because it "was concerned that hospitals were 'dumping' patients who were unable to pay, by either refusing to provide emergency medical treatment or transferring patients before their conditions were stabilized." *Eberhardt v. City of Los Angeles,* 62 F.3d 1253, 1255 (9th Cir.1995).

Although the immediate concern of Congress was "to ensure that hospitals do not refuse essential emergency care because of a patient's inability to pay," *id.* at 1258, the language of the Act does not condition its operation on that motive. We have held that "[t]he legislative history of the Act does indi-

cate that Congress intended to prevent hospitals from refusing to treat or from dumping patients who lack insurance coverage." *Brooker v. Desert Hosp. Corp.,* 947 F.2d 412, 414 (9th Cir.1991). Nevertheless, the language of the Act "does not set forth any specific economic status criteria that limit the types of individuals covered by the Act." *Id.* Because the Act is clear on its face, we have held "that the Act applies to any and all patients, not just to patients with insufficient resources." *Id.* at 415.

Ms. James' claim is based on subsection (c) of the Act. The relevant portions of the statute are set out in the margin.[2] Accord-

oonciliation Act). The opinion is written in words rather than acronyms to make it easier to read.

**2. § 1395dd. Examination and treatment for emergency medical conditions and women in labor**

**(a) Medical screening requirement.** In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under this title [42 USCS §§ 2395 et seq.]) *comes to the emergency department* and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1)) exists.

**(b) Necessary stabilizing treatment for emergency medical conditions and labor.** (1) In general. If any individual (whether or not eligible for benefits under this title [42 USCS §§ 1395 et seq.]) *comes to a hospital* and the *hospital determines that the individual has an emergency medical condition,* the hospital must provide either-

(A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or

(B) for transfer of the individual to another medical facility *in accordance with subsection (c).*

. . .

**(c) Restricting transfers until individual stabilized.** (1) Rule. If an individual *at a hospital* has an emergency medical condition which has not been stabilized (within the meaning of subsection (e)(3)(B)), the hospital may not transfer the individual unless-

(A)(i) the individual (or a legally responsible person acting on the individual's behalf) after being informed of the hospital's obligations under this section and of the risk of transfer, in

writing requests transfer to another medical facility,

(ii) a physician (within the meaning of section 186(r)(1)[42 USCS § 1395x(r)(1)]) has signed a certificate that[,] based upon the information available at the time of transfer, the medical benefits reasonably expected from the provision of appropriate medical treatment at another medical facility outweigh the increased risks to the individual and, in the case of labor, to the unborn child from effecting the transfer, or

(iii) if a physician is not physically present *in the emergency department* at the time an individual is transferred, a qualified medical person (as defined by the Secretary in regulations) has signed a certification described in clause (ii) after a physician (as defined in section 186(r)(1) [42 USCS § 1395x(r)(1)]), in consultation with the person, has made the determination described in such clause, and subsequently countersigns the certification; and

(B) the transfer is an appropriate transfer (within the meaning of paragraph (2)) to that facility.

A certificate described in clause (ii) or (iii) of subparagraph (A) shall include a summary of the risks and benefits upon which the certification is based.

(2) Appropriate transfer. An appropriate transfer to a medical facility is a transfer-

(A) in which the transferring hospital provides the medical treatment within its capacity which minimizes the risks to the individual's health and, in case of a woman in labor, the health of the unborn child;

(B) in which the receiving facility-

(i) has available space and qualified personnel for the treatment of the individual, and

(ii) has agreed to accept transfer of the individual and to provide appropriate medical treatment;

. . .

**(e) Definitions.** In this section:

(1) The term "emergency medical condition" means-

ing to the plain language of the Act, the duties outlined in subsection (a) apply when an individual "comes to the emergency department" and a "request is made on the individual's behalf for examination or treatment;" subsection (b) applies when an individual "comes to a hospital and the hospital determines that the individual has an emergency medical condition;" and subsection (c) applies when someone is "at a hospital" and "has an emergency medical condition." Ms. James purports to state a claim under subsection (c), as an individual who was "at a hospital" and "has an emergency condition." She makes no claim under subsection (a) or (b). The hospital argues that there is no such thing as a claim under subsection (c) not implicating subsection (b). Its theory is that unless and until the hospital "determines that the individual has an emergency medical condition" under subsection (b), the transfer restrictions of subsection (c) do not operate.

The issue is close and difficult. If Congress had connected subsections (a), (b) and (c) with the word "and," that would compel the hospital's construction. If "or," Ms. James's construction. But Congress did neither.

Ms. James correctly points out that subsection (c) requires only that the patient "has" an emergency medical condition, as distinguished from subsection (b)'s requirement that the hospital so "determine[ ]." Her point has considerable force. The words support it. Also, if the hospital cannot be liable under the statute unless it "determines

that the individual has an emergency medical condition," then hospitals are invited to evade the statute by instructing their staffs to make no such determinations.

There are, however, serious arguments on the hospital's side. Careful examination of the text supports the proposition that subsection (c) regulates transfers made pursuant to subsections (a) and (b), rather than creating an alternative basis for hospital liability. Subsection (a) tells the hospital to provide appropriate screening for emergency conditions to people who come to the emergency room. Subsection (b) tells the hospital that if it determines that a person has an emergency condition, the hospital generally must either examine and treat it, or provide for transfer "in accordance with subsection (c)." 42 U.S.C. § 1395dd(b)(1)(B). Subsection (c) generally restricts transfers of people with unstabilized emergency conditions unless the patient makes an informed request, a doctor signs a certificate, or if a doctor "is not physically present in the emergency department," a proper certificate is otherwise signed. 42 U.S.C. § 1395dd(c)(1)(A)(iii).

It is hard to see why Congress would say in subsection (b) that the transfer has to be "in accordance with subsection (c)," unless it meant for subsection (c) to regulate the transfers made in accord with subsection (b). The transfer section, (c), appears to be designed to deal with some people who are found to have emergency medical conditions under subsection (b).

(A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in-

(i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy,

(ii) serious impairment to bodily functions, or

(iii) serious dysfunction of any bodily organ or part; or

. . .

(2) The term "participating hospital" means hospital that has entered into a provider agreement under section 1866 [42 USCS § 1395cc].
(3) (A) The term "to stabilize" means, with respect to an emergency medical condition described in paragraph (1)(A), to provide such

medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility, or, with respect to an emergency medical condition described in paragraph (1)(B), to deliver (including the placenta).

. . .

(4) The term "transfer" means the movement (including the discharge ) of an individual outside a hospital's facilities at the direction of any person employed by (or affiliated or associated, directly or indirectly, with) the hospital, but does not include such a movement of an individual who (A) has been declared dead, or (B) leaves the facility without the permission of any such person.
42 U.S.C. § 1395dd (1988)(emphasis added).

It is impossible to think of a good reason why Congress would condition some subsection (c) transfer provisions on whether a physician "is not physically present in the emergency room," unless it meant to be speaking in subsection (c) about decisions to be made in the emergency room. Here is the text, in subsection (c), which speaks of individuals "at a hospital":

(iii) if a physician is not physically present *in the emergency department* at the time an individual is transferred, a qualified medical person (as defined by the Secretary in regulations) has signed a certification described in clause (ii) after a physician (as defined in section 186(r)(1) [42 USCS § 1395x(r)(1) ]), in consultation with the person, has made the determination described in such clause, and subsequently countersigns the certification; and

Hospitals are often big buildings or complexes of multiple big buildings. It would make no sense for the authority of physicians proposing to transfer a patient from the eleventh floor of building III to be affected by whether a physician was physically present in the emergency room on the first floor of building I. Congress must have been contemplating patients who were in the emergency room when it wrote this provision of section (c).

Thus we read the transfer restrictions of 42 U.S.C. § 1395dd(c) to apply only when an individual "comes to the emergency room," and after "an appropriate medical screening examination," "the hospital determines that the individual has an emergency medical condition."

We do not adopt the hospital's argument that unless it "determines that the individual has an emergency medical condition," under subsection (b), it cannot be liable. We said in *Eberhardt* that screening at less than an appropriate level will not satisfy the Act, but that the hospital's duty to stabilize the patient under subsection (b) does not arise until the hospital detects the emergency condition. *Eberhardt,* 62 F.3d at 1258–59. We do not decide in this case whether a bad faith determination would amount to a determination at all for purposes of subsection (b), because there is no allegation of bad faith. Nor is there an allegation that the screening was less than "appropriate," as required by subsection (a). Patients have state law protection against bad faith determinations because the federal provisions expressly "do not preempt any State or local law requirement, except to the extent that the requirement directly conflicts with a requirement of this section." 42 U.S.C. § 1395dd(f). State law could subject hospitals to tort liability for negligent failure to detect emergency conditions, and could conceivably adopt the federal statute as a standard of care, *see* Restatement of Torts 2d § 286, all without directly conflicting with the federal provisions. Because we read all three subsections together, so the subsection (c) transfer restrictions apply only to patients who go to the emergency room, we do not reach whether the hospital's failure correctly to examine or diagnose Ms. James condition would have the paradoxical effect of screening it from liability to her. As in *Eberhardt,* we are not accepting the proposition that, so long as the hospital does so bad a job that it never even spots emergencies, it cannot be liable. *Id.* at 1258.

Because the question is close, and the statute could reasonably be construed either way, we have been much influenced in the construction we adopt by the desire to avoid intercircuit conflict. All four other circuits to consider this or related questions have held that there is no liability under subsection (c) unless there has been a determination under subsection (b). *Baber v. Hospital Corp. of America,* 977 F.2d 872, 883 (4th Cir.1992); *Urban v. King,* 43 F.3d 523, 525–27 (10th Cir.1994); *Gatewood v. Washington Healthcare Corp.,* 933 F.2d 1037, 1041 (D.C.Cir. 1991); *see also Cleland v. Bronson Health Care Group,* 917 F.2d 266, 271 (6th Cir.1990). The Virginia Supreme Court has reached a contrary conclusion, by reading the subsections in the disjunctive as Ms. James urges. *Smith v. Richmond Memorial Hospital,* 243 Va. 445, 416 S.E.2d 689, 692 (1992). The Virginia opinion is forcefully reasoned. Nevertheless, the question is close; there is virtue in uniformity of federal law as construed by the federal circuits; and there is textual support for the construction reached by the other circuits.

■ We do not consider Ms. James's argument that she should have been allowed to amend her complaint by dropping her allegation that the hospital failed properly to determine whether an emergency condition existed, because it was not raised until her reply brief, and the amendment would not have affected the result. Except for that, she does not contend that she should have been allowed to amend.

AFFIRMED.