Mayda LOPEZ–SOTO, et al., Plaintiffs,

v.

Jose HAWAYEK, et al., Defendants.

No. Civ. 94–1808 (SEC).

United States District Court,
D. Puerto Rico.

Dec. 31, 1997.

Harry Anduze–Montano, Hato Rey, PR, Guillermo Ramos–Luina, Hato Rey, PR, for Plaintiffs.

Luis F. Montijo, Hato Rey, PR, Jose A. Rivera–Cordero, San Juan, PR, Pedro J. Cordova–Pelegrina, San Juan, PR, Angel R. De Corral–Julia, De Corral & De Mier, San Juan, PR, for Defendants.

## OPINION AND ORDER

CASELLAS, District Judge.

This case is before the Court on defendant Hospital Auxilio Mutuo's motion for summary judgment (**Docket # 70**),[1] which was duly opposed (**Docket # 80, 87**). Defendant essentially contends that the Court should grant summary judgment in its favor because plaintiffs have failed to assert a cause of action under the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd (1994). Upon careful examination of the facts, the applicable law and the arguments advanced by both parties, the Court finds that defendant's motion should be **GRANTED.**

### Procedural Background

The unfortunate incidents which gave rise to this action took place on June 12, 1993, a few hours after plaintiff Mayda López–Soto arrived at the Auxilio Mutuo Hospital pursuant to her obstetrician's instructions, to give birth to her first child. When she arrived at the hospital shortly after midnight, she was evaluated by hospital personnel and admitted to her doctor's care. At the time, plaintiff did not appear to be suffering from an emergency medical condition, and she was experiencing normal labor pains. When her obstetrician, Dr. José Hawayek, arrived at the hospital later that morning, he examined her and ruptured the membranes of her amniotic sack, identifying the presence of thick "pea soup meconium." At 11:00 a.m., Dr. Hawayek ordered a caesarean section, and plaintiff went into the operating room at 1:30 p.m. Upon delivering the baby at 1:50 p.m., Dr. Hawayek noticed that the newborn was experiencing severe respiratory distress as a re-

---

1. Although defendants refer to their motion as a "motion to dismiss," the motion shall be treated as a summary judgment motion pursuant to Rule 12(b) of the Federal Rules of Civil Procedure, which reads, in pertinent part, that:
   [i]f, on a motion ... to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56 ...
   Fed.R.Civ.P. 12(b).

sult of having inhaled meconium. Given the delicate situation, he promptly ordered the attending nurse to call the pediatrician on duty at the hospital. In response to this call, Dr. Martin Garrido showed up at the hospital about forty minutes later.[2]

As soon as Dr. Garrido examined the baby, he determined that the baby's condition required specialized treatment only available at a neonatal intensive care unit and he made arrangements to have the child transferred to the Damas Hospital in Ponce which, unlike the Auxilio Mutuo, had a neonatal intensive care unit.[3] Upon learning of the hospital's intentions to transfer the baby to a hospital which was located more than an hour away, the baby's father, plaintiff Raúl Mariani–Franco, called a relative of his who, as a physician, had privileges at the San Juan-based Pediatric Hospital and managed to secure a vacancy at its Neonatal Intensive Care Unit. As soon as the baby arrived at the Pediatric Hospital, he received treatment for a pneumothorax which he had developed at the Auxilio Mutuo, and his condition improved markedly. Nevertheless, additional complications ensued shortly thereafter, and the baby died at approximately 8:30 p.m. on June 13, 1993.

There are various contested issues of material fact regarding the treatment which the baby received prior to being transferred, and whether defendant, the Auxilio Mutuo hospital, followed the proceedings established by EMTALA for the transferring of emergency room patients from one hospital to another. Yet, for reasons which will be explained below, these facts are not relevant to the determination of whether plaintiffs have indeed asserted a cause of action under EMTALA.

## Summary Judgment Standard

The First Circuit has recently noted that: [s]ummary judgment is a means of determining whether a trial is actually required. It is appropriately granted when the record shows that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Thus, in order to defeat a properly crafted summary judgment motion, the party opposing it must demonstrate that a trialworthy issue looms as to a fact which could potentially affect the outcome of the suit. *Serapion v. Martinez*, 119 F.3d 982 (1st Cir. 1997). *See also McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir.1995).

For a dispute to be "genuine", "the factual controversy 'must be sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side'." *Lynne Woods–Leber v. Hyatt Hotels of Puerto Rico, Inc.*, 124 F.3d 47 (1st Cir.1997). *See also U.S. v. One Parcel of Real Property*, 960 F.2d 200, 204 (1st Cir.1992); *Boston Athletic Assn. v. Sullivan*, 867 F.2d 22, 24 (1st Cir. 1989). By like token, "material" means that the fact is one that might affect the outcome of the suit under the governing law. *Morris v. Government Development Bank of Puerto Rico*, 27 F.3d 746, 748 (1st Cir.1994).

In determining whether to grant a summary judgment, the Court may not, however, weigh the evidence. *Casas Office Machines, Inc. v. Mita Copystar America, Inc.*, 42 F.3d 668 (1st Cir.1994). Summary judgment "admits of no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails." *Id. citing Greenburg v. Puerto Rico Maritime Shipping Authority*, 835 F.2d 932, 936 (1st Cir.1987). Accordingly, if the facts permit more than one reasonable inference, the court on summary judgment may not adopt the inference least favorable to the non-moving party. *Casas Office Machines*, 42 F.3d at 684.

Given the foregoing, we must examine the facts, as presented by the parties, to determine whether there is any genuine issue of material fact involved. There is none.

## Applicable Law

■ It is undisputed that Congress enacted the Emergency Medical Treatment and

---

**2.** During the forty minutes which preceded Dr. Martin Garrido's arrival at the hospital, Dr. Eloy Ruiz–Pagán, the anesthesiologist in charge, tended to the newborn.

**3.** At the time of the birth of the baby, Auxlio Mutuo did not have an operating neonatal intensive care unit. The unit was still being prepared and equipped for service. It was opened in August, 1993.

Active Labor Act ("EMTALA")—or the Anti–Dumping Act, as it is otherwise commonly known—with a clear and specific purpose in mind: to allay concerns "about the increasing number of reports that hospital emergency rooms [were] refusing to accept or treat patients with emergency conditions if the patient [did] not have medical insurance." ·Correa v. Hospital San Francisco, 69 F.3d 1184, 1189 (1st Cir.1995), citing H.R.Rep. No.241(I), 99th Cong., 1st Sess. 27 (1986), reprinted in 1986 U.S.C.C.A.N. 42, 605. See also, generally, Barry R. Furrow, An Overview and Analysis of the Impact of the Emergency Medical Treatment and Active Labor Act, 16 J. Legal Med. 325 (Sept. 1995); Diane S. Mackey, The Emergency Medical Treatment and Active Labor Act: An Act Undergoing Judicial Development, 19 U.Ark. Little Rock L.J. 465 (May 1997).

■ The Act itself did not limit its coverage to persons without economic resources for emergency care.[4] Mackey, supra at 466. See also Alicia K. Dowdy, et al., The Anatomy of EMTALA: A Litigator's Guide, 27 St. Mary's L.J. 463, 465 (1996). But neither did it ."provide a private cause of action against the. hospital and physician for misdiagnosis or improper treatment, areas traditionally governed by state malpractice law." Furrow, supra at 326. See also. Correa, 69 F.3d at 1192; Vickers v. Nash General Hospital,

78 F.3d 139, 142 (4th Cir.1996); Baber v. Hospital Corp. of America, 977 F.2d 872, 879 (4th Cir.1992).[5]

Despite the Act's clear and specific purpose, the available case law has failed to agree on a uniform interpretation of its most relevant. provisions, 42 U.S.C. § 1395dd(a), (b) and (c). While some cases have opted for a disjunctive interpretation of sections (a) and (b),[6] others have chosen to interpret them conjunctively, or as an interrelated whole.[7]

Most courts have determined—or at least implied—that the pertinent EMTALA provisions must be analyzed conjunctively, taking into consideration the context of the statute and not isolating its individual provisions. Thus, for instance, in James v. Sunrise Hospital, 86 F.3d 885 (9th Cir.1996), the Ninth Circuit interpreted "the transfer restrictions of 42 U.S.C. § 1395dd(c) to apply only when an individual 'comes to the emergency room,' and after 'an appropriate medical screening examination,' 'the hospital determines that the individual has an emergency medical condition.' " Id. at 889 (emphasis ours).

Similarly, in Miller v. Medical Center of Southwest Louisiana, 22 F.3d 626 (5th Cir. 1994), the Fifth Circuit rendered its interpretation of the Act, and held that its "duties are only triggered when an individual 'comes to

---

4. The Act provides, in pertinent part, that:
   (a) .. In the case of a hospital that has a hospital emergency-department, if any individual ... comes to the emergency department and a request is made on the individual's be-.half for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department ...
   (b) ... If any individual ... comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either ...
      (A) ... for such further medical examination and such treatment as may be required to stabilize the medical condition, or
      (B) for transfer of the individual to another medical facility in accordance with subsection (c) of this provision.

5. All of the federal circuit courts which have interpreted EMTALA have unanimously agreed that the Act was not meant to provide plaintiffs with a federal malpractice cause of action.

6. Such courts have held that a patient does not necessarily have to come to the hospital in a state of emergency for the EMTALA provisions to apply; and that the Act's provisions may be applicable if the emergency medical condition arises at the hospital. See, e.g., Smith v. Richmond Memorial Hospital, 243 Va. 445, 416 S.E.2d 689 (1992); and Reynolds v. Mercy Hospital, 861 F.Supp. 214 (W.D.N.Y.1994).

7. These courts have essentially determined, or at least implied, that for sections (b) and (c) to apply, the patient must be able to comply with section (a); that is, he or she must have arrived at the participating hospital with an emergency medical condition seeking treatment. See, e.g., Vickers v. Nash General Hospital, 78 F.3d 139 (4th Cir.1996); Miller v. Medical Center of Southwest Louisiana, 22 F.3d 626 (5th Cir.1994); Baber v. Hospital Corp. of America, 977 F.2d 872 (4th Cir.1992); and James v. Sunrise Hospital, 86 F.3d 885 (9th Cir.1996).

an emergency department and a request is made on the individual's behalf for examination or treatment ...' These two preconditions are conjunctive requiring both that an individual 1) comes to the emergency department and 2) that a request be made." *Id.* at 628 (citations omitted).

The Fourth Circuit has also interpreted the Act taking the statute as a whole and within its textual context. For example, in *Baber v. Hospital Corp. of America*, 977 F.2d 872 (4th Cir.1992), it held that "the hospital's duty to provide an appropriate medical screening arises only if the patient seeks treatment from the emergency department." *Id.* at 884. Furthermore, in determining that the EMTALA provisions had to be read conjunctively, the Fourth Circuit in *Vickers v. Nash General Hospital*, 78 F.3d 139 (4th Cir.1996) underscored the fact that "[t]he duty created by EMTALA [was] a 'limited' one ..." *Id.* at 142 (citations omitted); and that it was "not intended to duplicate preexisting legal protections, but rather to create a new cause of action, generally unavailable under state tort law, for what amounts for failure to treat." *Id.* (citations omitted).

Although the First Circuit has yet to take an explicit stand on this issue, in its only opinion to date interpreting the Act, Judge Bruce Selya appeared to lean toward a conjunctive interpretation of the relevant EMTALA provisions when it summarized them as follows:

> First, it requires that a participating hospital afford appropriate medical screening to all persons who come to its emergency room seeking medical assistance. *See* 42 U.S.C. § 13995dd(a). Second, it requires that, if an emergency medical condition exists, the participating hospital must render the services that are necessary to stabilize the patient's condition, *see Id.* § 1395dd(b)(1)(A), unless transferring the

patient to another facility is medically indicated and can be accomplished with relative safety, *see id.* § 1395dd(b)(1)(B), (c)(1). *Correa*, 69 F.3d at 1190. More importantly, in outlining the elements which must be established in order to successfully claim that a particular hospital has violated this Act,[8] the First Circuit referred to cases which have opted for a conjunctive interpretation of the Act. *See Correa*, 69 F.3d at 1190.

It is also noteworthy that, when listing the special responsibilities of Medicare hospitals in emergency cases, the Code of Federal Regulations has interpreted all three parts of section 1395dd as interrelated, i.e., as stating that for EMTALA to apply, a patient has to come to the hospital seeking emergency treatment; the hospital is then required to make an appropriate screening, and if and when the hospital determines that the patient has an emergency medical condition, the hospital must go through the necessary stabilizing and/or transfer procedures established by the Act. *See* 42 C.F.R. ¶ 489.24.

■ Based on the undisputed fact that EMTALA was meant to address a very specific concern, we are persuaded by the arguments set forth by those courts which have opted to interpret EMTALA's pertinent provisions conjunctively, taking into consideration the "cardinal rule that a statute is to be read as a whole, since the meaning of the statutory language, plain or not, depends on context." *Conroy v. Aniskoff*, 507 U.S. 511, 515, 113 S.Ct. 1562, 1565, 123 L.Ed.2d 229 (1993). Hence, we hold, as did the Court in *Vickers*, that EMTALA "imposes two principal obligations on hospitals. First, it requires that when an individual seeks treatment at a hospital emergency room, 'the hospital ... provide for an appropriate medical screening examination to determine whether or not an emergency medical condition' exists ... Second, if the

---

8. Plaintiff must prove that:
   (1) the hospital is a participating hospital, covered by EMTALA, that operates an emergency department (or an equivalent treatment facility); (2) the patient arrived at the facility seeking treatment; and (3) the hospital either (a) did not afford the patient an appropriate screening in order to determine if she had an emergency medical condition, or (b) bade fare-

well to the patient (whether by turning her away, discharging her, or improvidently transferring her) without first stabilizing the emergency medical condition.
*Id.*, referring to *Miller v. Medical Ctr. of S.W. La.*, 22 F.3d 626, 628 (5th Cir.1994); *Stevison v. Enid Health Sys., Inc.*, 920 F.2d 710, 712 (10th Cir. 1990).

screening examination reveals the presence of an emergency medical condition, the hospital ordinarily must 'stabilize the medical condition' before transferring or discharging the patient." *Id.* at 142 (citations omitted). We will now proceed to apply this standard to the instant case.

### Application of Law to Facts

■ As stated previously, plaintiff Mayda López–Soto did not come to the Hospital Auxilio Mutuo's emergency department seeking treatment. In fact, plaintiff López–Soto did not suffer from an emergency medical condition at any time while at the Auxilio Mutuo, nor does she assert otherwise. It was rather her son, born at the hospital, who exhibited such distress signals from the moment he was delivered. Thus, the question before the Court is whether EMTALA applies to a child who is born at a hospital with an emergency medical condition, even though for obvious reasons, he did not "come to the hospital" seeking treatment for this condition. We believe that it does not.

In reaching this conclusion, we are guided by our belief that were we to allow cases such as the instant one to fall within EMTALA's protective mantle, we would be interpreting the statute way beyond the scope originally intended by Congress, and also more broadly than envisioned by the courts which have interpreted the Act. In other words, we would indeed be transforming this statute into a basis for creating a generalized, federal malpractice cause of action in cases involving any emergency medical condition arising in a hospital, regardless of the congressional intent and the constraints contained in the statute.

Since we have held that EMTALA is not applicable to the case which is before us, we need not delve into the question of whether Hospital Auxilio Mutuo complied with the Act's transfer provisions, 42 U.S.C. 1395dd(c). For the foregoing reasons, defendant's motion for summary judgment (**Docket # 70**), is hereby **GRANTED**.

### Supplemental Jurisdiction claims

It is hornbook law that district courts have discretion to exercise supplemental jurisdiction over the state law claims where the state and federal claims derive from a common nucleus of operative facts. *See*, 28 U.S.C. § 1367; *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). Nevertheless, where, as here, the only existing federal claim warrants dismissal prior to trial, the district court should decline to exercise supplemental jurisdiction.

Some courts have stated that the holding in *Gibbs* "seems clearly to require dismissal without action on the merits and without any exercise of discretion if all the federal claims ... are found to be short of trial, deficient." *See, e.g., Snowden v. Millinocket Regional Hosp.* 727 F.Supp. 701, 709 (D.Me.1990). Such a result is warranted in view that "[t]he power of a federal court to hear and to determine state-law claims in non-diversity cases depends upon the presence of at least one 'substantial' federal claim in the lawsuit". *Newman v. Burgin*, 930 F.2d 955, 963 (1st Cir.1991). *See also Vera–Lozano v. International Broadcasting*, 50 F.3d 67 (1st Cir. 1995).

■ Although district courts are not obligated to dismiss pendent state law claims, in the usual case in which the federal-law claim is dismissed before trial, the balance of factors to be considered under the pendent jurisdiction doctrine-judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state law claims. In such a case, state-law claims should be dismissed. *Carnegie–Mellon University v. Cohill*, 484 U.S. 343, 350 n. 5, 108 S.Ct. 614, 619, 98 L.Ed.2d 720 (1988); citing *Gibbs*, 383 U.S. at 726–727, 86 S.Ct. at 1139–40; *see Mercado–Garcia v. Ponce Federal Bank*, 979 F.2d 890, 896 (1st Cir.1992); *Rivera v. Murphy*, 979 F.2d 259, 264 (1st Cir.1992); *Figueroa Ruiz v. Alegria*, 896 F.2d 645, 646 (1st Cir.1990); Cf. *Vega v. Kodak Caribbean*, 3 F.3d 476, 478 (1st Cir.1993) (holding that "when the district court disposed of the ADEA claims, the pendent claims became subject to dismissal for want of subject matter jurisdiction"); *Feinstein v. Resolution Trust Corp.*, 942 F.2d 34, 47 (1st Cir.1991) (stating that "since federal question jurisdiction hinged on that [dismissed] count, and

there was no complete diversity of citizenship or other cognizable basis for the assertion of subject matter jurisdiction in the district court, the pendent state law claims were properly dismissed under the rule of *United Mine Workers v. Gibbs* ").

Supplemental jurisdiction should be declined in this case in view that the state law claims substantially predominate over the federal claim. The Supreme Court has held that judicial economy, convenience, fairness and comity favors "a decision to relinquish jurisdiction when 'state issues predominate, whether in terms of proof, of the scope of the issued raised, or the comprehensiveness of the remedy sought'." *Carnegie–Mellon,* 484 U.S. at 350 n. 5, 108 S.Ct. at 619, *citing Gibbs* 383 U.S. at 726, 86 S.Ct. at 1140. Since plaintiff is not entitled to any award under EMTALA, the only award plaintiff could, in any event, pursue would be under state tort law. Based on the foregoing, this Court will decline to exercise jurisdiction over plaintiff's remaining state claims against the defendants. The case shall therefore, be **DISMISSED.** Judgment will be entered accordingly.

**SO ORDERED.**