Mayda LOPEZ–SOTO, Et al.,
Plaintiffs, Appellants,

v.

Jose HAWAYEK, M.D., Et al.,
Defendants, Appellees.

No. 98–1594.

United States Court of Appeals,
First Circuit.

Heard March 2, 1999.

Decided April 9, 1999.

Guillermo Ramos Luiña, with whom Harry Anduze Montaño was on brief, for appellants.

José A. Rivera Cordero, with whom Pedro Lugo Frank, Luis F. Montijo and Mirta Rodriguez Mora were on brief, for appellees.

Before SELYA, Circuit Judge, COFFIN and CYR, Senior Circuit Judges.

SELYA, Circuit Judge.

This appeal presents a fundamental question concerning the interpretation of the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd (1994) (amended 1997). We neither minimize the difficulty of the question nor pretend that the answer is transpiciously clear. Upon careful perscrutation, however, we hold that EMTALA subsections (a) and (b) are to be read disjunctively, not conjunctively. Accordingly, we reverse the district court's contrary ruling and reinstate the plaintiffs' action.

## I. BACKGROUND

We rehearse only those facts necessary to add a modicum of texture to our statutory analysis, accepting as true the appel-

lants' version of events. *See* Fed.R.Civ.P. 56. For ready reference, we reproduce EMTALA's pertinent provisions in an Appendix.

Experiencing normal labor pains, Mayda López–Soto arrived at Auxilio Mutuo Hospital (the Hospital) in the early morning hours of June 12, 1993. Hospital personnel brought her to the maternity ward where she was examined and admitted. Dr. José Hawayek, an obstetrician, broke her water at approximately 7:30 a.m., revealing the presence of thick "pea soup" meconium in the amniotic fluid. Rupturing the membranes of the amniotic sac failed to stimulate dilation, so Dr. Hawayek ordered a cesarean section. López–Soto gave birth to a baby boy at 1:50 p.m. (roughly 15 minutes after the operation commenced). The infant emerged in severe respiratory distress due to meconium aspiration. His condition presented a medical emergency.

Hospital staffers summoned Dr. Martín Garrido, the pediatrician on call. Dr. Garrido determined that the baby required specialized care and began making arrangements to transfer him to a hospital with a functioning neonatal intensive care unit. Before transport occurred, Dr. Garrido identified an additional cause for medical concern: the presence of a pulmonary pneumothorax. He nonetheless elected to send the infant to the receiving hospital without first attempting to stabilize the patient or to treat that exigent condition. The baby was admitted to the San Juan Pediatric Hospital that evening, but perished the next day.

López–Soto and her husband brought suit on behalf of themselves and the deceased child in Puerto Rico's federal district court.[1] The complaint named as defendants the Hospital and several caregivers, including Drs. Hawayek and Garrido. López–Soto premised jurisdiction on the presence of a federal question, *see* 28 U.S.C. § 1331, that question being

1. For ease in reference, we treat López–Soto    as if she were the sole plaintiff.

the existence of a putative cause of action against the Hospital arising under federal law (to wit, EMTALA). She added supplemental claims for medical malpractice under local law against all the defendants.

Only the EMTALA claim is relevant here. In her complaint, López–Soto posited that the Hospital violated EMTALA because her baby was born "with a severe pulmonary condition that required emergency and immediate medical care and treatment," but the Hospital nonetheless transferred him to another institution without stabilizing this condition. The defendants denied the material allegations of the complaint and contested jurisdiction, saying that EMTALA did not apply. After considerable jousting (not relevant here), the district court, acting pursuant to Fed.R.Civ.P. 56, accepted the defendants' jurisdictional argument and dismissed the EMTALA claim. At the same time, the court declined to retain supplemental jurisdiction over the medical malpractice claims, dismissing them without prejudice. *See* 28 U.S.C. § 1367(c). This appeal ensued.

## II. ANALYSIS

López–Soto's EMTALA claim hinges on the Hospital's alleged failure to comply with the statute's stabilization and transfer provisions. *See* 42 U.S.C. § 1395dd(b)-(c). In a thoughtful opinion, the district court concluded that Congress's isthmian concern with patient dumping—the practice of refusing to accept or treat patients who are uninsured or have no demonstrable means of payment—precluded reading these provisions independently of 42 U.S.C. § 1395dd(a). *See López–Soto v. Hawayek*, 988 F.Supp. 41, 45 (D.P.R.1997). The court therefore adopted a conjunctive interpretation of all three subsections and ruled that they create statutory duties for a covered hospital solely with regard to persons who come to the emergency department for assistance. *See id.* Only in that event must the hospital provide an appropriate medical screening, 42 U.S.C. § 1395dd(a); and, only if that screening uncovers an emergency medical condition must the hospital stabilize the patient and refrain from transferring him except in compliance with the statutory commands, *see* 42 U.S.C. § 1395dd(b)-(c).

Superimposing this interpretation upon the scenario depicted by López–Soto, the district court reasoned that the newborn had not come to the Hospital's emergency room seeking treatment for his respiratory distress, but, rather, had come to the Hospital via the operating room. *See López–Soto*, 988 F.Supp. at 46. Consequently, the court determined that EMTALA's stabilization and transfer obligations had not been triggered and that López–Soto had failed to state a cognizable claim under federal law. *See id.*

We afford plenary review to the district court's resolution of this unadulterated question of law. *See, e.g., United States v. Gifford*, 17 F.3d 462, 472 (1st Cir.1994). We start our search for the meaning of the words that Congress wrote with an appraisal of the statutory text and structure, *see Inmates of Suffolk County Jail v. Rouse*, 129 F.3d 649, 653 (1st Cir. 1997), mindful that if the plain language of the statute points unerringly in a single direction, an inquiring court ordinarily should look no further. *See United States v. Charles George Trucking Co.*, 823 F.2d 685, 688 (1st Cir.1987).

EMTALA has a long reach. It touches all acute care hospitals that have executed Medicare provider agreements with the federal government pursuant to 42 U.S.C. § 1395cc. *See* 42 U.S.C. § 1395dd(e)(2); *see also Correa v. Hospital San Francisco*, 69 F.3d 1184, 1189–90 (1st Cir.1995). Moreover, it imposes myriad duties on these covered hospitals.

For the most part, these duties reside in three principal statutory silos. The most familiar of these is subsection (a), which imposes a duty to triage. This duty takes the form of a requirement that a covered hospital perform an "appropriate medical screening examination" on "any individual"

who "comes to the emergency department" seeking examination or treatment. 42 U.S.C. § 1395dd(a). Clearly, this provision obligates hospitals to screen only those individuals who present themselves at the emergency department.

■ Subsection (b) has a different focus. It emphasizes stabilization, not screening. Thus, if "any individual . . . comes to a hospital and the hospital determines that the individual has an emergency medical condition," the hospital must try to stabilize that condition, and can shift the patient to another institution only in accordance with EMTALA's transfer provisions. 42 U.S.C. § 1395dd(b). This language unambiguously imposes certain duties on covered hospitals vis-à-vis *any* victim of a detected medical emergency, regardless of how that person enters the institution or where within the walls he may be when the hospital identifies the problem. *See Helton v. Phelps County Regional Med. Ctr.*, 794 F.Supp. 332, 333 (E.D.Mo.1992); *Smith v. Richmond Mem'l Hosp.*, 243 Va. 445, 451–52, 416 S.E.2d 689, 692 (1992). Nothing in the subsection's text suggests a necessary relationship between a hospital's obligations and the identity of the department within the hospital to which the afflicted individual presents himself.

Subsection (c) seemingly has relevance to both of the preceding subsections. It provides that "[i]f an individual at a hospital has an emergency medical condition which has not been stabilized . . . , the hospital may not transfer the individual" save upon compliance with certain stipulated conditions. 42 U.S.C. § 1395dd(c)(1). This subsection does not distinguish between patients whose conditions are diagnosed in the emergency room and those whose conditions emerge in other hospital departments.

■ We reject the district court's attempt to meld these three duties together principally because doing so necessitates eschewal of subsection (b)'s plain language—"comes to a hospital"—in favor of

a phrase—"comes to the emergency department"—that appears only in subsection (a). This compressed approach renders the "comes to a hospital" language meaningless; after all, if subsection (a)'s predicate requirement that an individual "come[ ] to the emergency department" were understood to infiltrate subsection (b), the latter's "comes to a hospital" requirement would be altogether superfluous. It is a time-honored tenet that "[a]ll words and provisions of statutes are intended to have meaning and are to be given effect, and no construction should be adopted which would render statutory words or phrases meaningless, redundant, or superfluous." *United States v. Ven-Fuel, Inc.*, 758 F.2d 741, 751–52 (1st Cir. 1985). We are reluctant to disregard this venerable canon of construction, especially since a sensible, available interpretation of the statute—one that places the three subsections side by side, rather than in lockstep—gives effect to both phrases.

■■ A further canon of construction has relevance here. The fact that Congress used the "comes to an emergency department" language in subsection (a) while employing different phraseology ("comes to a hospital") in subsection (b) serves to emphasize the separateness of the statutory commands. "[I]t is generally presumed that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another." *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 537, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994) (citations and internal quotation marks omitted). Courts have an obligation to refrain from embellishing statutes by inserting language that Congress opted to omit. *See Keene Corp. v. United States*, 508 U.S. 200, 208, 113 S.Ct. 2035, 124 L.Ed.2d 118 (1993). So it is here. Congress's decision to change the "emergency department" language rather than to repeat it in subsection (b) is potent evidence that Congress preferred to cast a wider net in respect to stabilization.

■ Finally, a disjunctive approach draws strength from the fact that subsection (b) mentions neither an emergency room locus nor a medical screening as a precursor to a hospital's stabilization obligations. Rather, those obligations attach as long as an individual enters any part of the hospital and the hospital determines that an emergency medical condition exists. *See* 42 U.S.C. § 1395d(b)(1). As a practical matter, a hospital more often than not will discover the existence of an emergency medical condition by performing the screening required under subsection (a)—but nothing in EMTALA's language or structure makes subsection (b) an adjunct to subsection (a). Moreover, punctuation can provide valuable insights into statutory interpretation, *see United States v. Ron Pair Enters., Inc.* 489 U.S. 235, 241–42, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989), and we cannot overlook that Congress chose structurally to disconnect the three subsections, closing them off from each other by periods, without any conjunctive links. A statute should be parsed as punctuated unless some good reason exists to read it otherwise. *See* 2A Sutherland, *Statutes and Statutory Construction* § 47.15, at 179 (5th ed.1992).

We are not the only court to conclude that EMTALA requires such a disjunctive reading. In what appears to have been the first case addressing the issue, the Virginia Supreme Court found "nothing in the language of the Act which limits application of [subsections (b) and (c) ] solely to a patient who initially arrives at the emergency room." *Smith,* 243 Va. at 452, 416 S.E.2d at 692. Consequently, the court concluded that a plaintiff who had not come to the defendant hospital's emergency room nonetheless could sue under subsection (c) for an allegedly improper transfer. *See id.; see also Reynolds v. Mercy Hosp.,* 861 F.Supp. 214, 222 (W.D.N.Y. 1994); *Helton,* 794 F.Supp. at 333.

The Tenth Circuit also has accepted the disjunction between subsections (a) and (b). In *Urban v. King,* 43 F.3d 523 (10th Cir.1994), a pregnant woman went to the hospital for a stress test (not conducted in the emergency department). Despite warning signs, the hospital sent her home. When she returned the following day, the hospital belatedly determined that she had an emergency condition and began efforts to stabilize her. The woman sued, claiming that the hospital violated EMTALA *on the first day* by sending her home without stabilizing her emergency condition. Although the case was decided on a different ground, the court said that subsection (a) was beside the point. *See id.* at 525 n. 2. This dictum can only mean that the court did not consider emergency room arrival to be a prerequisite to liability under either subsection (b) or (c).

We find further support for our interpretation in *Roberts v. Galen of Va., Inc.,* — U.S. ——, 119 S.Ct. 685, 142 L.Ed.2d 648 (1999). In the underlying opinion, the Sixth Circuit imported an intent requirement from subsection (a) into subsection (b), and ruled that, in a subsection (b) case, a plaintiff must show that the hospital acted with an improper motive in failing to stabilize. *See Roberts v. Galen of Va., Inc.,* 111 F.3d 405, 410 n. 3, 411 (6th Cir.1997); *see also Cleland v. Bronson Health Care Group, Inc.,* 917 F.2d 266, 272 (6th Cir.1990) (holding that to prove inappropriateness under subsection (a), a plaintiff must show an improper motive undergirding the hospital's actions). The Supreme Court rejected on textual grounds this attempt to transplant a standard from subsection (a) into subsection (b). *See Roberts,* 119 S.Ct. at 686. Taking a similar textual approach, we find that subsection (b), unlike subsection (a), contains no requirement of entry through the portals of the emergency department. Thus, by analogy to *Roberts,* the plain language of the statute militates against importation of the "emergency department" requirement from subsection (a) into subsection (b).

To these marshaled authorities, we add that a disjunctive "plain language" reading

of the statute works no fatuity. Subsection (a) requires hospitals to provide appropriate screening for individuals who seek assistance at an emergency department of a covered hospital, whereas subsection (b) serves a different purpose—obligating hospitals to stabilize individuals (wherever in the hospital they may be) when emergency medical conditions are detected. In short, these two provisions create distinct obligations and apply to different classes of individuals. *See Smith,* 243 Va. at 451, 416 S.E.2d at 692. Moreover, it makes good sense to restrict subsection (a) screenings to emergency room arrivals, given the peculiar set of problems associated with treatment in such facilities. By contrast, the broader, hospital-wide sweep of subsection (b) makes equally good sense. While screening is arguably the key to ensuring the health of itinerants who arrive at an emergency room, stabilization is arguably the key to ensuring the health of those already admitted to the hospital who develop emergency medical conditions.

To be sure, the proponents of a conjunctive reading possess some ammunition—but, for the most part, they are shooting blanks. The appellees prominently mention several cases interpreting subsection (c) to impose liability only upon a prior subsection (b) determination that the transferee patient suffers from an emergency medical condition. *See, e.g., Vickers v. Nash Gen'l Hosp., Inc.,* 78 F.3d 139, 145 (4th Cir.1996); *Urban,* 43 F.3d at 525; *Gatewood v. Washington Healthcare Corp.,* 933 F.2d 1037, 1041 (D.C.Cir.1991). We question the relevance of these precedents. The linkage of subsections (b) and (c) finds explicit support in the text of subsection (b)(1), which ties the need for stabilization of discerned emergency medical conditions to the transfer restrictions imposed by subsection (c). *See* 42 U.S.C. § 1395dd(b)(1)(B) (explaining that, if a

hospital determines that an emergency medical condition exists, it either must stabilize the individual or transfer him "in accordance with subsection (c)"). This furnishes a sound reason, *embedded in the statute's text,* to read subsection (c)'s qualified prohibition on unstabilized transfers in tandem with subsection (b)'s requirement that the hospital actually detect the emergency medical condition.

Although conjoining subsections (b) and (c) therefore makes linguistic and structural sense, no similar justification exists for marrying subsection (a) to subsection (b). The mere fact that two pieces of a statutory puzzle may be interdependent in a particular way does not mean that all the pieces must fit together in the same manner. As we have said, the language and structure of subsections (a) and (b) counsel in favor of a disjunctive interpretation. The district court's attempt to merge these two provisions renders nugatory key language pertaining to the scope of the statute. We see no compelling reason to sacrifice the statute's plain language on the altar of interdependence in order artificially to interlock subsections (a) and (b).

Even though the case law bundling subsections (b) and (c) is off point, there are some other straws in the wind that blow in the appellees' direction. For example, in *James v. Sunrise Hosp.,* 86 F.3d 885 (9th Cir.1996), a Ninth Circuit panel stated that subsection (c)'s transfer restrictions "apply only when an individual *comes to the emergency room,* and after an appropriate screening examination, the hospital determines that the individual has an emergency medical condition." *Id.* at 889 (emphasis supplied; internal quotation marks omitted). In making this statement, the *James* panel, like the court below, construed subsections (a), (b), and (c) as relating to a single sequence of events.[2] *See id.* The court forged this link largely on the

2. This three-way conjunctive construction was gratuitous. To resolve the issue before it, the court needed to decide only whether subsections (b) and (c) should be read conjunc-

tively. The added step that the court took—linking subsection (a) to subsections (b) and (c)—was wholly unnecessary.

basis of a phrase found in 42 U.S.C. § 1395dd(c)(1)(A)(iii). With respect, we think that this cross-reference cannot carry the weight that *James* placed upon it.

Subsection (c) generally prohibits transfers of unstabilized patients unless the patient has so requested in writing, *see id.* § 1395dd(c)(1)(A)(i), a physician has certified that the medical benefits of an appropriate transfer outweigh the attendant risks, *see id.* § 1395dd(c)(1)(A)(ii), or, "if a physician is not physically present in the emergency department at the time an individual is transferred, a qualified medical person" has signed the certificate after consulting with a physician who has made the transfer decision and who subsequently countersigns, *id.* § 1395dd(c)(1)(A)(iii). *James* fastens onto this "not physically present in the emergency department" language, overlooking that the provision addresses only a discrete subset of transfer circumstances—the physical inability of a physician to sign the requisite certificate when time is of the essence—that Congress likely associated with emergency room "on call" arrangements. Indeed, Congress's intention not to ensconce the certification procedure within the exclusive domain of the emergency department is made manifest by the language of 42 U.S.C. § 1395dd(c)(1)(A)(ii), which prescribes an independent procedure for effecting unstabilized transfers without imposing any limitation on where certification decisions must be made. That same intent is also evinced in 42 U.S.C. § 1395dd(b)(1)(A), which directs use of the staff and resources of the *entire* hospital facility to stabilize a patient once an emergency medical condition determination has been made. Since the *James* court's reading of the transfer restrictions flies in the teeth both of EMTALA's physician-wide certification option and its hospital-wide

stabilization requirement, we decline to follow it.[3]

In settling upon a conjunctive reading of subsections (a) and (b), the district court fretted most over legislative purpose. *See López–Soto*, 988 F.Supp. at 43–44. It cannot be gainsaid that, in enacting EMTALA, Congress was driven by a concern that hospitals were refusing to admit and treat uninsured patients. *See H.R.Rep. No. 99–241(I), at 27 (1986), reprinted in 1986 U.S.C.C.A.N. 579, 605; see also Correa*, 69 F.3d at 1189. The lower court believed that allowing EMTALA's stabilization and transfer obligations to apply outside the context of emergency room arrivals would extend the statute's reach beyond this particularized concern with patient dumping. For three reasons, we think that this is too cramped a view.

■ In the first place, courts interpret statutes primarily through detailed analysis of concrete statutory language, not by reference to abstract notions of generalized legislative intent. *See Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253–54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992) (reiterating "that courts must presume that a legislature says in a statute what it means and means in a statute what it says there"); *see also Correa*, 69 F.3d at 1194 (concluding that, notwithstanding Congress's focus on patient dumping, an individual's financial status plays no part in determining the reach of subsection (a)). Put another way, although legislative purpose can shed light upon congressional intent where Congress has blown an uncertain trumpet, it cannot serve as the baseline for statutory construction.

In the second place, Congress obviously had a horizon broader than the emergency room in mind when it enacted EMTALA. The statute explicitly embraces women in labor, *see* 42 U.S.C. § 1395dd(e)(1)(B) (defining emergency medical condition)—yet

---

**3.** The only other court of appeals to have so much as hinted at a similar result did so in a context in which the individual involved never physically presented himself at the hospital, and, thus, did not decide whether coming to

the hospital, as opposed to the emergency department, would suffice to galvanize subsection (b). *See Miller v. Medical Ctr. of S.W. La.*, 22 F.3d 626, 629–30 (5th Cir.1994). It is, therefore, of no assistance here.

most gravid women go to maternity wards, not emergency rooms, when they are ready to give birth.

Last, but surely not least, Congress's preoccupation with patient dumping is served, not undermined, by forbidding the dumping of *any* hospital patient with a known, unstabilized, emergency condition. After all, patient dumping is not a practice that is limited to emergency rooms. If a hospital determines that a patient on a ward has developed an emergency medical condition, it may fear that the costs of treatment will outstrip the patient's resources, and seek to move the patient elsewhere. That strain of patient dumping is equally as pernicious as what occurs in emergency departments, and we are unprepared to say that Congress did not seek to curb it. *Accord Smith,* 243 Va. at 452, 416 S.E.2d at 692.

The district court also worried that, without an emergency room arrival limitation, EMTALA might be converted into a federal cause of action for medical malpractice. *See López–Soto,* 988 F.Supp. at 46. We agree that Congress did not intend such a result, *see Correa,* 69 F.3d at 1192, but we suspect that the district court's fears are overblown.[4] *Cf.* William Shakespeare, Macbeth, act 1, sc. 3 (1605) (warning that present fears may be "less than horrible imaginings"). In all events, the paradigmatic EMTALA circumstances of the instant case give us no occasion to address such looming issues. Here, the newborn's emergency condition was apparent upon presentment and the corresponding decision to transfer was made immediately.

## III. CONCLUSION

█ We need go no further. Because subsections (a) and (b) of EMTALA oper-

ate disjunctively rather than conjunctively, the infant decedent's arrival in the operating room and the Hospital's prompt detection of an emergency medical condition, if proven, will suffice to engage the gears of EMTALA's stabilization and transfer obligations. *See* 42 U.S.C. § 1395dd(b). It follows that the district court erred in dismissing the complaint on jurisdictional grounds. Whether López–Soto has made out the other elements of an EMTALA claim is, of course, a different question— and one that is not now before us. At this stage of the litigation we conclude only that the absence of emergency room presentment does not preclude prosecution of this suit under 42 U.S.C. § 1395dd(b).

In light of this conclusion, we reverse the district court's dispositive order and remand for further proceedings. The district court must, *inter alia,* reinstate the pendent claims which it previously dismissed.

***Reversed and remanded.***

### STATUTORY APPENDIX

**§ 1395dd. Examination and treatment for emergency medical conditions and women in labor**

### (a) Medical screening requirement

In the case of a hospital that has a hospital emergency department, if any individual ... comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an

---

**4.** The principal problem is a temporal one. Requiring hospital-wide stabilization of individuals with emergency medical conditions raises the question of how long subsection (b)'s stabilization obligations persist. If stabilization were mandated by EMTALA without limit of time, it might well encroach upon the province of state malpractice law. Withal,

other courts have found ways to cabin such undue expansions of EMTALA into the malpractice realm. *See, e.g., Bryan v. Rectors and Visitors of Univ. of Va.,* 95 F.3d 349, 352 (4th Cir.1996) (interpreting EMTALA to include a temporal limitation on a hospital's obligations). We leave for another day precisely how we will deal with this conundrum.

emergency medical condition (within the meaning of subsection (e)(1) of this section) exists.

### (b) Necessary stabilizing treatment for emergency medical conditions and labor

#### (1) In general

If any individual ... comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either—

(A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or

(B) for transfer of the individual to another medical facility in accordance with subsection (c) of this section.

...

### (c) Restricting transfers until individual stabilized

#### (1) Rule

If an individual at a hospital has an emergency medical condition which has not been stabilized (within the meaning of subsection (e)(3)(B) of this section), the hospital may not transfer the individual unless—

(A)(i) the individual (or a legally responsible person acting on the individual's behalf) after being informed of the hospital's obligations under this section and of the risk of transfer, in writing requests transfer to another facility,

(ii) a physician ... has signed a certification that based upon the information available at the time of transfer, the medical benefits reasonably expected from the provision of appropriate medical treatment at another medical facility outweigh the increased risks to the individual and, in the case of labor, to the unborn child from effecting the transfer, or

(iii) if a physician is not physically present in the emergency department at the time an individual is transferred, a qualified medical person (as defined by the Secretary in regulations) has signed a certification described in clause (ii) after a physician ..., in consultation with the person, has made the determination described in such clause, and subsequently countersigns the certification; and

(B) the transfer is an appropriate transfer (within the meaning of paragraph (2)) to that facility.

A certification described in clause (ii) or (iii) of subparagraph (A) shall include a summary of the risks and benefits upon which the certification is based.

\* \* \*

42 U.S.C. § 1395dd (1994) (amended 1997).