173 F.3d 517
 BELL ARTHUR WATER CORPORATION, Plaintiff-Appellant,
and
Daniel R. Glickman, Secretary, United States Department of
Agriculture, Plaintiff,
v.
GREENVILLE UTILITIES COMMISSION; City of Greenville, NC;
Ironwood Development, Incorporated, Defendants-Appellees.
North Carolina Rural Water Association; Arkansas Rural
Water Association; South Carolina Rural Water
Association; Eastern Pines Water
Corporation; Texas Rural
Water Association,
Amici Curiae.
 No. 97-2533.
 United States Court of Appeals,
Fourth Circuit.
 Argued Sept. 22, 1998.
Decided April 9, 1999.
 
 ARGUED: Louis Thomas Rosenberg, Law Offices of Louis T. Rosenberg, P.C., San Antonio, Texas, for Appellant. William Jarvis Little, III, Little & Swank, L.L.P., Greenville, North Carolina, for Appellees. ON BRIEF: W.H. Watson, Speight, Watson & Brewer, Greenville, North Carolina, for Appellant. Philip R. Dixon, Dixon, Doub & Conner, Greenville, North Carolina, for Appellee Commission; David A. Holec, City Attorney, Greenville, North Carolina, for Appellee City; Danny D. McNally, Gaylord, McNally, Strickland & Snyder, Greenville, North Carolina, for Appellee Ironwood. J.W. Dyer, Sharon Almaguer, Dyer & Denham, P.L.L.C., McAllen, Texas, for Amici Curiae.
 Before NIEMEYER, HAMILTON, and LUTTIG, Circuit Judges.
 OPINION
 NIEMEYER, Circuit Judge:
 
 
 1
 Bell Arthur Water Corporation, a provider of water service to rural areas in Pitt County, North Carolina, seeks protection under § 306(b) of the Consolidated Farm and Rural Development Act, 7 U.S.C. § 1926(b), against the competitive actions of the City of Greenville and the Greenville Utilities Commission. The City annexed an area known as Ironwood, which Bell Arthur claims was in its service area, and the Commission began providing water service to the area.
 
 
 2
 The district court ruled that Bell Arthur did not meet two threshold requirements of § 1926(b) and therefore was not entitled to its protection. Bell Arthur Water Corp. v. Greenville Utilities Comm'n, 972 F.Supp. 951 (E.D.N.C.1997). Agreeing with the district court on the absence of one of the statutory requirements, we affirm.
 
 
 3
 * Through the enactment of the Agricultural Act of 1961, Congress sought, among other things, to improve and protect farm prices and farm income and to promote farm development and the distribution of agricultural commodities. See S.Rep. No. 566, 87th Cong., 1st Sess., reprinted in 1961 U.S.C.C.A.N. 2243, 2243. As part of this effort, Title III, originally known as the Consolidated Farmers Home Administration Act (amended in 1972 to become known as the Consolidated Farm and Rural Development Act), 7 U.S.C. § 1921 et seq., authorizes the Secretary of Agriculture to facilitate credit through insured loans as necessary "to finance [farmers'] acquisition, improvement, and operation of farms." Id. at 2305. Section 306 of the Consolidated Farm and Rural Development Act specifically authorizes federal loans to nonprofit water service associations to promote the "conservation, development, use, and control of water" to assist farmers, ranchers, farm tenants, and other rural residents. 7 U.S.C. § 1926(a)(1). By including water service to "other rural residents" as part of an agricultural program, Congress intended (1) to reduce peruser cost resulting from the larger base of users, (2) to provide greater security for the federal loans made under the program, and (3) to provide a safe and adequate supply of water. See 1961 U.S.C.C.A.N. at 2309. In short, through the mechanisms of the Consolidated Farm and Rural Development Act, Congress intended to provide a "very effective program of financing the installation and development of domestic water supplies and pipelines serving farmers and others in rural communities." Id.
 
 
 4
 To protect these nonprofit water service associations and hence the federal loans made to them, Congress included a provision in the Consolidated Farm and Rural Development Act "to assist in protecting the territory served by such an association facility against competitive facilities, which might otherwise be developed with the expansion of the boundaries of municipal and other public bodies into an area served by the rural system." Id. This protective provision, § 306(b) of the Act, provides:
 
 
 5
 The service provided or made available through any such association shall not be curtailed or limited by inclusion of the area served by such association within the boundaries of any municipal corporation or other public body, or by the granting of any private franchise for similar service within such area during the term of such loan; nor shall the happening of any such event be the basis of requiring such association to secure any franchise, license, or permit as a condition to continuing to serve the area served by the association at the time of the occurrence of such event.
 
 
 6
 7 U.S.C. § 1926(b). While this section provides qualifying associations with protection from infringing actions of municipal corporations and other public bodies, the protection is limited to (1) the time period during which the association has a federal loan outstanding from the Farmer's Home Administration ("FmHA"),[1] and (2) the geographical area in which the association provides or makes service available. The infringing actions prohibited by this section include curtailment or limitation of the associations' service areas through annexation or through the imposition of conditions for service such as the requirement of a franchise, license, or permit.
 
 
 7
 In this case, Bell Arthur contends that the City of Greenville and the Greenville Utilities Commission curtailed and limited its service to an area in Pitt County known as Ironwood by annexing the area and by providing water service to it. Ironwood is the site of a development which, when built out, will have 994 upscale houses and two golf courses. The City and the Commission argue that Bell Arthur is not entitled to the statutory protection of § 1926(b) because (1) Bell Arthur did not have an outstanding loan with the FmHA for the Ironwood development, and (2) Bell Arthur was not providing or making water service available to Ironwood.
 
 II
 
 8
 The facts are not materially in dispute. Bell Arthur is a North Carolina nonprofit water service corporation formed in 1970 to provide water service in certain rural areas of Pitt County. Beginning in 1970, Bell Arthur obtained loans and grants from the FmHA to finance improvements of its water system. Using part of a loan obtained from FmHA in 1979, Bell Arthur installed a six-inch water line along North Carolina Highway 43 which runs through the Ironwood area.
 
 
 9
 In 1989, pursuant to a Congressional mandate that the Secretary of Agriculture sell certain insured notes to raise cash, Bell Arthur had the opportunity to purchase its own notes and did so, thereby retiring its federal indebtedness. But four years later, in 1993, Bell Arthur again borrowed money from the FmHA to finance the extension of water service to an area known as Otter Creek. As in the past, Bell Arthur pledged the revenue from all of its customer accounts to secure repayment of this 1993 loan.
 
 
 10
 In furtherance of its plan to develop Ironwood, Ironwood Development, Inc. (the "Developer"), approached Greenville Utilities Commission in late 1994, requesting both water and sewer service to the Ironwood area. During this same period, the Developer also petitioned the City of Greenville to annex the Ironwood area. The Commission agreed in December 1994 to provide sewer service to Ironwood, and the City granted the annexation petition in January 1995. But after failed negotiations with Bell Arthur over who should provide water service to the area, the Commission relented, at least temporarily, and referred the Developer to Bell Arthur who had a six-inch pipeline running through the proposed development area.
 
 
 11
 In its discussions with Bell Arthur on providing water service, the Developer requested a method by which the costs for sewer service from the Greenville Utilities Commission could be billed by Bell Arthur along with the water service. In anticipation of providing water service to Ironwood, Bell Arthur directed its engineering consultants in early 1995 to analyze Bell Arthur's capability of serving the area. The engineering consultants concluded that the project would require a new tank and a 14-inch water line to the area which would cost Bell Arthur approximately $650,000 to construct. In May 1995, Bell Arthur agreed in writing to provide temporary and permanent water service to Ironwood. It also began providing water service from its existing six-inch line to a temporary construction trailer at the Ironwood site.
 
 
 12
 Bell Arthur did not, however, take any other steps to provide water to Ironwood until early 1996 when it obtained the necessary permits from the state. Not until August 1996, and then at the urging of its legal counsel, did Bell Arthur's board of directors resolve to borrow the necessary funds to construct the facility recommended by its engineers. In December 1996, Bell Arthur obtained a loan commitment from a private bank to lend it $1 million for the project, conditioned on the outcome of this litigation.
 
 
 13
 Meanwhile, in July 1995, Greenville Utilities Commission informed the Developer that since Ironwood was "an integral part of the city," it was willing to provide water service and that it had already ordered pipe to construct the necessary line. Because the Commission offered lower rates and consumers would find it easier to deal with a single utility, the Developer rescinded its request to Bell Arthur for water service on August 15, 1995, and two days later requested water service from the Commission. Within two months, by October 5, 1995, the Commission completed construction of a 12-inch water line to the Ironwood area. Bell Arthur, however, continued service to the Developer's construction trailer until February 1996.
 
 
 14
 Contending that the Greenville Utilities Commission's installation of the pipeline and the City of Greenville's annexation of the Ironwood area curtailed and limited Bell Arthur's service to that area, Bell Arthur filed suit in November 1995, alleging that both the City and the Commission violated § 306(b) of the Consolidated Farm and Rural Development Act, 7 U.S.C. § 1926(b).
 
 
 15
 On cross motions for summary judgment filed by all parties, the district court granted the Greenville defendants' motions against Bell Arthur and denied Bell Arthur's motion. In doing so, the court ruled that Bell Arthur was not entitled to protection under § 1926(b) because (1) "any protection afforded to [Bell Arthur] pursuant to § 1926(b) was extinguished when Bell Arthur paid off its FmHA loans in 198," 972 F.Supp. at 959; (2) Bell Arthur's federal loan in 1993 for the Otter Creek project did not confer § 1926(b) protection for the Ironwood area because the Otter Creek obligations were not directly related to the service proposed for Ironwood, 972 F.Supp. at 960-61; and (3) Bell Arthur was not, as required for statutory protection, providing water service or making water service available to Ironwood in that it was "not capable of providing the requisite service within a reasonable time after application was made for the service," 972 F.Supp. at 963 (internal quotations omitted).
 
 
 16
 This appeal followed.
 
 III
 
 17
 Bell Arthur challenges first the district court's conclusion that it was not indebted to the FmHA and therefore was not protected by 7 U.S.C. § 1926(b) which affords protection only "during the term" of a loan insured by the Rural Development Insurance Fund. It argues (1) that it satisfied the indebtedness requirement even though it retired its federal debt in 1989 because, in retiring the debt, it purchased its notes from the FmHA pursuant to a statutory provision which explicitly continued § 1926(b) protection, and (2) that it qualifies for 1926(b) protection on the basis of the 1993 loan obtained from FmHA for the Otter Creek project. We address these arguments in order.
 
 
 18
 * In 1989, Bell Arthur took out a loan from a private lender and with the proceeds bought back all of its then outstanding notes issued to FmHA and cancelled them, thus retiring all of its federal indebtedness. It contends that even though it retired its federal indebtedness, it retained the protections of § 1926(b) by reason of the statutory structure under which it retired its indebtedness.
 
 
 19
 Section 1001(a) of the Omnibus Budget Reconciliation Act of 1986 ("OBRA") required FmHA to sell off enough federally insured notes to raise specified amounts of revenue for the federal government to reduce the national deficit. See OBRA, Pub.L. No. 99-509, § 1001(a), 100 Stat. 1874 (1986). That Act was amended one year later by the Agricultural Credit Act of 1987 to provide any water service association which had issued notes to the FmHA a right of first refusal to purchase its own notes at a discount before they were offered for sale to the general public under § 1001(a). See Agricultural Credit Act of 1987, Pub.L. No. 100-233, Title VIII, § 803(f), 101 Stat. 1714 (1988); OBRA § 1001(f) as amended. The Agricultural Credit Act provided specifically, "[b]efore conducting a sale of a portfolio of notes or other obligations under this section [OBRA § 1001], the Secretary of Agriculture shall ... determine whether the issuer of any unsold note or other obligation desires to purchase the note or other obligation." Id. The Agricultural Credit Act also amended OBRA to provide that the protections of § 1926(b) "shall be applicable to all notes or other obligations sold or intended to be sold under this section [§ 1001 of OBRA]." Agricultural Credit Act of 1987, § 803(g); OBRA § 1001(g).
 
 
 20
 Bell Arthur argues that OBRA § 1001(g) afforded it continuing and uninterrupted § 1926(b) protection, despite its lack of continuing indebtedness to the federal government. It contends that § 1001(g) applies not only to sales to third parties under § 1001(a) but also to purchases by issuers under § 1001(f). While Bell Arthur's interpretation of OBRA § 1001 may have some superficial textual appeal, a closer reading of the applicable statutes reveals that such an interpretation is at odds with their language, the overall statutory structure, and the congressional purposes.
 
 
 21
 The Agricultural Credit Act added a right-of-first-refusal provision that allowed any issuer of notes ordered to be sold under OBRA to retire its indebtedness instead of having the notes sold to third parties. See Agricultural Credit Act of 1987, § 803(f); OBRA § 1001(f). OBRA § 1001(f), as amended, provides that "[b]efore conducting a sale of a portfolio of notes," the Secretary was required to offer the notes to the issuer. Id. (Emphasis added). The sale referred to in § 1001(f) is the same sale to third parties which is mandated by § 1001(a) and to which protection is extended by § 1001(g). Since the right of first refusal necessarily precedes the sale of a portfolio of notes, the issuer of the note who exercises the right of first refusal retires its debt before the notes can be "sold or intended to be sold" and therefore cannot receive the § 1926(b) protection granted by § 1001(g). This is simply a matter of logic.
 
 
 22
 Although this right-of-first-refusal provision is written in terms of the issuer's purchasing its own notes, thereby possibly confusing the sale to the issuer under § 1001(f) with a sale to third parties under § 1001(a), the two transactions are by nature quite distinct. And this distinction illuminates why Congress intended to continue § 1926(b) protection for notes to be sold to third parties but not for notes offered to the issuer. When the Secretary sells an issuer's notes to third parties under § 1001(a), the issuer's indebtedness remains outstanding. But when the Secretary sells an issuer's notes to the issuer itself under § 1001(f) and the issuer then cancels the notes--as occurred here--then the indebtedness ends.[2] The latter transaction is actually a retirement of the debt by the issuer rather than a sale of the debt.
 
 
 23
 Thus, when Congress added § 1001(g) to provide protection for notes sold under OBRA, it could not have meant to include notes retired because retired notes need no protection. The protection afforded by § 1926(b) is meant to secure outstanding notes against default by protecting the income of the notes' issuer. When the indebtedness--whether to the federal government or to its assignees--is retired, however, no such protection is needed.
 
 
 24
 Our interpretation is buttressed by the legislative purposes. One of the principal purposes of 7 U.S.C. § 1926(b) is to protect federal loans insured by the Rural Development Insurance Fund. This purpose is evident in the language § 1926(b) which extends the subsection's protection only "during the term of such loan." 7 U.S.C. § 1926(b). After Congress ordered the sale of these federally insured loans to help balance the budget, it added § 1001(g) to OBRA to continue the protection of § 1926(b) on the loans it was selling, undoubtedly to make them more secure upon sale and thus more marketable. Accordingly, OBRA § 1001, which requires the Secretary of Agriculture to "sell notes and other obligations held in the Rural Development Insurance Fund," § 1001(a), also provides that the protections of § 1926(b) "shall be applicable to all notes or other obligations sold or intended to be sold," § 1001(g). Thus, under § 1001(g), water services associations would continue to enjoy the income-preserving protections of § 1926(b) "during the term" of the loan, giving the third party purchaser the same assurance of repayment that the federal government had had as the holder of the notes.
 
 
 25
 Nowhere in OBRA, as amended by the Agricultural Credit Act, is there any indication that Congress intended to amend 7 U.S.C. § 1926(b) to delete the condition that its protections are afforded only "during the term of such loan." If the loan has been cancelled by the issuer's payment, then the indebtedness condition for § 1926(b) protection no longer is met.
 
 
 26
 Accordingly, we hold that OBRA § 1001(g) (extending § 1926(b) protections to notes sold or intended to be sold) applies only to sales of notes to third parties under § 1001(a) and not to the retirement of indebtedness authorized by § 1001(f). See Scioto County Reg'l Water Dist. No. 1 v. Scioto Water, Inc., 103 F.3d 38, 42 (6th Cir.1996) (holding that "[w]hen an issuer buys back its own bond and cancels the debt, ... it no longer qualifies as a debtor for § 1926(b) protection"); Rural Water Sys. #1 v. City of Sioux Center, 967 F.Supp. 1483, 1523 (N.D.Iowa 1997) (concluding that under the "plain meaning" of subsections 1001(f) and (g), no § 1926(b) protection attaches to an issuer's buy-back under § 1001(f)).
 
 B
 
 27
 If Bell Arthur is entitled to § 1926(b) protection for Ironwood, it must qualify for such protection based on its 1993 FmHA loan taken out to finance the extension of service to the Otter Creek project. Concededly, the Otter Creek project was not directly related to the service proposed for Ironwood. But Bell Arthur claims that the statute contemplates no territorial limitation on protection other than the limitation of an association's total service area--the area in which it has provided service or made service available. It argues further that even if the statute contained such a territorial restriction, Ironwood is protected because Bell Arthur pledged its entire water system to FmHA as security for repayment of the 1993 loan.
 
 
 28
 The Greenville defendants contend that § 1926(b) protection does not extend to the Ironwood area because Bell Arthur never intended to use its 1993 loan proceeds for Ironwood, but rather only for its Otter Creek project. The district court agreed, concluding that § 1926(b) grants protection only to the incremental improvements financed by the loan proceeds, not the entire water system. The court observed that, although it could envision the possibility of an entire water system appropriately pledged as security to FmHA, "this is not such a case." 972 F.Supp. at 961.
 
 
 29
 We can find no statutory support for the Greenville defendants' position that the scope of § 1926(b) protection is limited to the geographical area being financed by the loan. In addition, it would defeat the protections intended by that section to limit them as proposed by the Greenville defendants.
 
 
 30
 Congress could have included in § 1926(b) a restriction that provided protection only in the areas developed and served by the association with the loan proceeds. Instead, the statute provides protection for "the area served by such association." 7 U.S.C. § 1926(b). While the area served is defined by where service has been provided or made available, no statutory or regulatory language restricts protection to the area served by the proceeds of the loan.
 
 
 31
 Moreover, the Greenville defendants' position would undermine the purposes of the § 1926(b) protections. Bell Arthur's ability to repay its federal loan and to provide low peruser cost to its customers does not rest solely on the economic well-being and territorial integrity of the service areas financed by the 1993 loan. To the contrary, both of these goals depend on economies of scale and maximization of Bell Arthur's entire customer base, and can only be accomplished by treating the protection as applicable to the entire service area rather than merely the increments improved by the loan.
 
 
 32
 The Greenville defendants' arguments, if carried to their logical conclusion, would wreak havoc on the statutory scheme. If a municipality could annex or provide water to all areas not specifically covered by current loans, then an indebted association could lose the bulk of its customer base. Such a loss would certainly have an adverse impact on the financial viability of the water service association and its concomitant ability to repay its federal loans. It would also force the association to charge each of the remaining users more for water service, which is precisely the opposite of what Congress intended when enacting § 1926(b).
 
 
 33
 To reach its unduly limited interpretation of § 1926(b), the district court apparently relied on the statement of an official representing the U.S. Department of Agriculture at the summary judgment hearing. In response to the court's factual question as to whether Bell Arthur had pledged its entire service area as security for the 1993 FmHA loan, the official stated, "So, yes, we may have a lien on whatever revenues they have, but we may not have any revenues from that particular area in question." Pressed on whether he was enunciating the position of the Secretary of Agriculture, the official read from a statement prepared by the USDA Regional Counsel in Atlanta, asserting that "the Federal Government's position is that the loan obligation must be directly related to the service area in question. The fact that a party may have loans from the Government for servicing an entirely different area does not qualify it for protection from all unrelated areas." J.A.2001-02.
 
 
 34
 The district court's reliance on this statement is unjustified on two grounds. First, under the Chevron doctrine, deference to an agency's interpretation of a statute is not proper if the language of the statute is plain, as it is in this case. See Chevron U.S.A. Inc. v. National Resources Defense Council, Inc., 467 U.S. 837, 842, 843 n. 9, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) ("If the intent of Congress is clear, that is the end of the matter.... The Judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent").
 
 
 35
 Second, the USDA official who made the statement to the district court was offering a legal conclusion as to the proper geographical scope of § 1926(b)'s protection in response to a factual question as to what was pledged as security for the 1993 FmHA loan. This conflation of the legal and the factual, we believe, renders the statement inconclusive on the USDA's official position on the statute.
 
 
 36
 In short, we conclude that the 1993 FmHA loan for the development of service to the Otter Creek project qualified Bell Arthur for § 1926(b) protection in its service area as that term is defined by the statute.
 
 IV
 
 37
 We are still left with the question of whether Ironwood was in Bell Arthur's service area--that area to which Bell Arthur provided service or made service available--because Bell Arthur is entitled to the protection of § 1926(b) only for that area. On this issue, we agree with the district court that Bell Arthur was not entitled to protection for the Ironwood area because it did not have the capacity to serve that area, nor did it have the capacity to provide such service within a reasonable time after the request for service was made.
 
 
 38
 Bell Arthur's claim that Ironwood was part of its service area rests solely on the fact that it had a six-inch pipeline running through the Ironwood area along Highway 43. From this pipeline, it had served from eight to twenty customers prior to 1986, and it served the Developer's construction trailer during the 1995-96 period. But the parties agree that a six-inch pipeline could not provide the capacity necessary to serve a development involving over 900 houses and two golf courses. Bell Arthur itself determined that it would need a 14-inch pipeline to serve the area, and the Greenville Utilities Commission determined that it would need a 12-inch pipeline.
 
 
 39
 While it is true that the Ironwood development was to be a phased development and therefore would not need the full water service at the beginning, Bell Arthur put forth no evidence that it would have had an adequate capacity within a reasonable amount of time to meet the Developer's schedule. To the contrary, after Bell Arthur formally agreed in May 1995 to provide water service to Ironwood, it took no meaningful steps at that time or within a reasonable time thereafter to undertake construction of a new pipeline. While it needed $650,000 to provide the service, it did not begin the process of applying for a loan until August 1996, over one year later. In contrast, by October 1995, the Greenville Utilities Commission had completed its 12-inch line to the Ironwood area.
 
 
 40
 The § 1926(b) protection afforded to Bell Arthur is limited to the area in which it provides service or makes service available. Inherent in the concept of providing service or making service available is the capability of providing service or, at a minimum, of providing service within a reasonable time. See North Alamo Water Supply Corp. v. City of San Juan, 90 F.3d 910, 916 (5th Cir.1996) (holding that a water association may establish the availability of service under § 1926(b) by demonstrating, inter alia, that it "has lines and adequate facilities to provide service to the disputed areas" (emphasis added)); see also Lexington--South Elkhorn Water Dist. v. City of Wilmore, 93 F.3d 230, 238 (6th Cir.1996) (noting that "an association's ability to serve [under § 1926(b) ] is predicated on the existence of facilities within or adjacent to a disputed property"). Having a six-inch pipeline in the ground when a 14-inch line is necessary provides no support to a claim that a water association has adequate facility to provide service. We conclude that in order to enjoy the protection of § 1926(b) for an area, an association must demonstrate as a threshold matter that it has adequate facilities within or adjacent to the area to provide service to the area within a reasonable time after a request for service is made.
 
 
 41
 We note that the Fifth Circuit has held that an association may demonstrate that it is "making service available" to an area when it has a statutory duty under state law to provide service to the area. See North Alamo, 90 F.3d at 915-16. Other circuits have found that "making service available" requires showing a duty imposed by state law to serve an area coupled with a nearby facility to provide the service. See Lexington--South Elkhorn, 93 F.3d at 235-37 (noting that proximity of water lines to the disputed area is a key factor in the making service available determination because Kentucky law requires obtaining a state-issued certificate and then making reasonable extensions of water lines to serve customer requests); Glenpool Utility Services Auth. v. Creek County Rural Water Dist. No. 2, 861 F.2d 1211, 1213-14 (10th Cir.1988) (concluding that state law duty to provide service upon customer request, in conjunction with a nearby water line, constituted making service available). None of these cases, however, provide Bell Arthur with support for its claim that it was making service available to Ironwood. Even if it had an adequate facility in Ironwood, it did not have a statutory duty to provide service to Ironwood. As a nonprofit water service corporation, Bell Arthur is not subject to the North Carolina statutory obligation of a public utility to serve a designated geographical area. See N.C. Gen. Stat. § 62-3(23)(d).
 
 
 42
 We hold that Bell Arthur's inadequate six-inch pipe in the ground coupled with only a general, unfulfilled intent to provide the necessary 14-inch pipe sometime in the future does not amount to "service provided or made available." 7 U.S.C. § 1926(b). Accordingly, we conclude that Bell Arthur was not entitled to protection under § 1926(b) against the City of Greenville's annexation of Ironwood or the Greenville Utility Commission's provision of water to Ironwood. The judgment of the district court is
 
 
 43
 AFFIRMED.
 
 
 
 [1]
 In 1994 the duties of the FmHA with respect to water and waste facility programs were transferred to the Rural Utilities Service. See 7 U.S.C. § 6942(c)(2)(A). Because the loans at issue in this case were issued by the FmHA, we continue, for ease of understanding, to refer to the FmHA
 
 
 [2]
 Because Bell Arthur cancelled its notes, we do not need to determine in this case whether protection would continue if the issuer purchased but did not cancel its own notes