**Christopher TORRETTI; Honey Torretti, as parents & natural guardians of Christopher J. Torretti, a minor, and in their own right, Appellants**

v.

**MAIN LINE HOSPITALS, INC., d/b/a Paoli Memorial Hospital; Andrew Gerson, M.D.; Main Line Perinatal Associates; Mark Finnegan, M.D.; Patricia McConnell, M.D.; McConnell, Peden, Belden & Associates; Lankenau Hospital.**

No. 08–1525.

United States Court of Appeals, Third Circuit.

Argued Jan. 28, 2009.

Opinion filed Sept. 2, 2009.

Barbara R. Axelrod, Esquire, (Argued), James E. Beasley, Jr., Esquire, Dion G. Rassias, Esquire, The Beasley Firm, Philadelphia, PA, for Appellant.

Daniel F. Ryan, III, Esquire, O'Brien & Ryan, Plymouth Meeting, PA, Peter J. Hoffman, Esquire, (Argued), Eckert, Seamans, Cherin & Mellott, Philadelphia, PA, for Appellees.

Before SCIRICA, Chief Judge, AMBRO, and SMITH, Circuit Judges.

## OPINION OF THE COURT

AMBRO, Circuit Judge.

This is our first opportunity to confront the Emergency Medical Treatment and Active Labor Act ("EMTALA" or the "Act"). 42 U.S.C. § 1395dd, *et seq.* Among other things, the Act forbids hospitals from refusing to treat individuals with emergency conditions, a practice often referred to as "patient dumping."

Appellants Christopher and Honey Torretti's son, Christopher, was born with severe brain damage after Mrs. Torretti's high-risk pregnancy went awry. On the morning of the birth, Mrs. Torretti went to her routine outpatient fetal monitoring ap-

pointment at a perinatal facility. The attending medical personnel at the facility directed her to her primary hospital for extended perinatal monitoring. She gave birth to Christopher shortly after arriving at the hospital. The Torrettis sued the hospitals and doctors involved under EMTALA, as well as state statutory and common-law claims. This appeal tests the boundaries of EMTALA, which is not a federal malpractice statute. Given these circumstances, relief for Christopher Torretti's traumatic brain injuries may be available in other forms, but is not provided under EMTALA. Thus, we affirm the District Court's grant of summary judgment.[1]

## I. Background

This case, like most cases brought under EMTALA, is tragic. This was Mrs. Torretti's second pregnancy. Her first child was born healthy. Both pregnancies were high-risk because she is an insulin-dependent diabetic. Her primary obstetrician was Dr. Patricia McConnell, a member of the Peden Group, an obstetrics practice group based out of Lankenau Hospital ("Lankenau"). Lankenau is part of the Main Line Health system and located in Wynnewood, Pennsylvania.

Because of Mrs. Torretti's diabetic condition (which can present complications during a pregnancy), Dr. McConnell referred her to the Paoli Hospital Perinatal Testing Center ("Paoli"), located in Paoli, Pennsylvania, for monitoring throughout both pregnancies. Paoli is a center for fetal monitoring and consultation only, and is located in a medical building adjacent to Paoli Hospital. It is also owned by Main Line Health. The two hospitals are approximately twenty miles apart.

In Mrs. Torretti's third trimester, she began to have complications, primarily involving premature contractions. During this period, the Peden Group increased Mrs. Torretti's monitoring appointments at Paoli to twice per week from once per month. The Peden Group also monitored her as an outpatient at Lankenau on one occasion in mid-April 2005. Two weeks later, when she went to Paoli for routine monitoring on April 30, the Paoli medical staff detected that she was experiencing pre-term labor and directed her to Lankenau where she was hospitalized for three days. On that occasion, she drove herself from Paoli to Lankenau.

Near the end of Mrs. Torretti's pregnancy, in her 34th week, she had a routine monitoring appointment scheduled at Paoli on Monday, May 23. Two days before the appointment, she called Dr. McConnell twice. First, she complained of contractions. Dr. McConnell told her to put her feet up and relax. The second time Mrs. Torretti called, the contractions had lessened, but she explained that she was very uncomfortable because of her large size and had noticed a decrease in fetal movement. She asked about the possibility of receiving a therapeutic amniocentesis, a treatment to reduce her discomfort by removing some of the excess amniotic fluid. Dr. McConnell advised her to drink a glass of ice water to try and stir the baby; thereafter, for whatever reason, Mrs. Torretti detected increased movement. The doctor also told her that she could come to Lankenau if she preferred, but that nothing could be done until Monday. Mrs. Torretti chose not to go the hospital that weekend and did not believe that her condition was emergent.[2]

---

1. The District Court had subject matter jurisdiction over this EMTALA action pursuant to 42 U.S.C. § 1395dd, *et seq.,* and supplemental jurisdiction over the state claims pursuant to 28 U.S.C. § 1367. We have appellate jurisdiction under 28 U.S.C. § 1291.

2. *See* App. 97 (Question: "Did you feel your condition was emergent on the 21st?" Mrs. Torretti's answer: "No.").

On May 23, the Torrettis drove to Paoli for the appointment, which included a routine ultrasound and a fetal non-stress test.[3] When Mrs. Torretti arrived at Paoli, she was feeling general discomfort, primarily because of the strain on her back from the large size of her abdomen. She was not alarmed about her condition and did not feel that she was in an emergent state.[4] She told Dr. Andrew Gerson, a perinatologist on Paoli's staff, about her conversation with Dr. McConnell over the weekend—that she was having a great deal of discomfort mainly due to her large size and had noticed a decrease in fetal movement, but that there was still some movement.

Dr. Gerson sat Mrs. Torretti in a chair and began the non-stress test. Over a 28-minute period, the test did not show expected fetal heart rate variability—normal accelerations and decelerations. Lack of variability in a non-stress test could be explained by a normal variant, such as a prolonged sleep cycle, or could be the sign of a problem. About the same time Mrs. Torretti began the non-stress test, her contractions returned. She indicated the "pain was so bad" that she was "grasping either the arm of the chair or both arms of the chair at once, and either almost grunting or to a degree yelling." The non-stress test indicated that she had 16 contractions in the 28 minutes of fetal monitoring—her contractions lasted approximately 50 to 70 seconds and were 1½ to 2½ minutes apart.

Dr. Gerson was aware of Mrs. Torretti's diabetic condition. He noted in her medical documents that her abdominal circumference was large—"off the charts." The fetus weighed approximately eleven pounds. Also, the ultrasound test indicated that she had excess amniotic fluid, but that the fetus "was moving its limbs and body."

Based on these preliminary test results and Mrs. Torretti's diabetic condition, Dr. Gerson terminated the non-stress test and sent her to Lankenau for longer-term monitoring of the baby.[5] In directing Mrs. Torretti to Lankenau, he also consulted with her regular doctor, Dr. McConnell, by telephone. Dr. Gerson testified that this plan appeared to be "perfectly safe" based on the "best information we had." He further testified that, even though she was having contractions, which had been commonplace throughout her third trimester, "delivery wasn't necessarily going to be imminent or need to be imminent and [ ] it was appropriate for her to go to Lankenau Hospital."[6] The nurse assisting Dr. Gerson commented to Mrs. Torretti that she believed Mrs. Torretti might deliver the baby sometime that day, but gave no indication of an emergency or imminency.

Mrs. Torretti testified that, while at Paoli, nothing in the statements or demeanor of anyone on Paoli's staff, including Dr. Gerson, indicated to her that her condition was emergent. For example, Mrs. Torretti stated that "[t]here was no

**3.** A non-stress test is a non-invasive test that measures fetal heart rate and contractions. Dr. Andrew Gerson, a perinatologist, explained that the test can last anywhere from 20 minutes to more than two hours, depending on the person.

**4.** *See* App. 101a (Question: "Did you feel your condition was emergent that day [at Paoli]?" Mrs. Torretti's answer: "No.").

**5.** Dr. Gerson stated that "one of the other concerns was [that Mrs. Torretti] be evaluated

for her own sugar status and diabetes status, which, again, was one of the factors that made me realize that I thought she was going to [a] need more prolonged period of monitoring than what we could provide for her."

**6.** Dr. McConnell confirmed this view in testifying that Dr. Gerson told her that Mrs. Torretti would need prolonged monitoring, but that he did not anticipate a delivery that day.

[ ] urgency, though, as far as I was concerned. [The nurse] seemed pretty calm, and that's usually a pretty good indicator" because "I could usually read [the nurse] pretty well, I had known her since I had been pregnant with my first child." In addition, when Dr. Gerson discontinued the monitoring and sent her to Lankenau for prolonged monitoring, Mr. Torretti asked whether it was an emergency and if they should go in an ambulance. Dr. Gerson replied that it was not that urgent and that an ambulance was not necessary. Nonetheless, he requested that they go directly to Lankenau. En route to Lankenau, however, they stopped at their home. With the stop, the 20-mile trip took them approximately 45 minutes door-to-door.

As is customary, Dr. Gerson sent an explanatory letter to the Lankenau medical personnel along with the Torrettis. When Mrs. Torretti arrived, she had to wait approximately 15 to 20 minutes for a room. She stated that when she was first connected to the monitor, her condition seemed to be about the same as it had been at Paoli, but then "it worsened very quickly." Shortly thereafter, another doctor with the Peden Group checked on her. When he looked at the preliminary results, he exclaimed "oh shit!" The doctors immediately rushed Mrs. Torretti into surgery and she gave birth via caesarean section. The baby, Christopher Torretti, was born with severe brain damage.

Defendants moved for summary judgment on the EMTALA claim. The District Court ruled that the Torrettis did not offer sufficient evidence to raise a reasonable inference that defendants, specifically Dr. Gerson, knew Mrs. Torretti presented a medical emergency, and thus failed to sustain their burden under EMTALA. *Torretti v. Paoli Mem. Hosp.*, No. 06–3003, 2008 WL 268066, at *1 (E.D.Pa. Jan. 29, 2008). Accordingly, it granted the motion for summary judgment, dismissing the only federal claim. It also declined to exercise supplemental jurisdiction over the Torrettis' remaining state claims.

## II. Standard of Review

When the District Court grants a motion for summary judgment, our review is plenary. *See Elsmere Park Club, L.P. v. Town of Elsmere*, 542 F.3d 412, 416 (3d Cir.2008) (citation omitted). Summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "We resolve all factual doubts and draw all reasonable inferences in favor of [ ] the nonmoving party." *See DL Res., Inc. v. FirstEnergy Solutions Corp.*, 506 F.3d 209, 216 (3d Cir.2007) (citation omitted). We may affirm or vacate the District Court's judgment on any grounds supported by the record. *Gorum v. Sessoms*, 561 F.3d 179, 184 (3d Cir.2009) (citation omitted).

## III. EMTALA Background

EMTALA requires hospitals to give certain types of medical care to individuals presented for emergency treatment: (a) appropriate medical screening, (b) stabilization of known emergency medical conditions and labor, and (c) restrictions on transfer of unstabilized individuals to outside hospital facilities. 42 U.S.C. § 1395dd(a)-(c) [7]; *see Urban v. King*, 43

---

7. The statute states in pertinent part:
(a) Medical screening requirement
In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under this subchapter) comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to deter-

F.3d 523, 525 (10th Cir.1994) (stating that a hospital has two primary obligations under EMTALA: (1) if an individual arrives at an emergency room, the hospital must provide appropriate medical screening to determine whether an emergency medical condition exists; and (2) if the hospital determines an individual has an emergency medical condition that has not been stabilized, it may not transfer the patient unless certain conditions are met).

Congress enacted EMTALA in the mid–1980s based on concerns that, due to economic constraints, hospitals either were refusing to treat certain emergency room patients or transferring them to other institutions. *See* 68 F.R. 53,222, 53,223 (Sept. 9, 2003); *see also* H.R.Rep. No. 99–241, pt.3, at 27 (July 31, 1985), *reprinted in* 1986 U.S.C.C.A.N. 579, 605 (indicating that Congress was "greatly concerned about the increasing number of reports that hospital emergency rooms are refusing to accept or treat patients with emergency conditions if the patient does not have medical insurance"). As noted above, this practice is known as "patient dumping." *Power v. Arlington Hosp. Ass'n,* 42 F.3d 851, 856 (4th Cir.1994). EMTALA requires hospitals to provide medical screening and stabilizing treatment to individuals seeking emergency care in a nondiscriminatory manner.[8] Although Congress was concerned that the indigent and uninsured tended to be the primary victims of patient dumping, EMTALA is not limited to these individuals. *See* 42 U.S.C. § 1395dd; *see also Roberts v. Galen of Virginia, Inc.,* 525 U.S. 249, 252, 119 S.Ct. 685, 142 L.Ed.2d 648 (1999) (holding that EMTALA does not require a plaintiff to show "that the hospital's inappropriate stabilization resulted from an improper motive such as one involving the indigency, race, or sex of the patient").

■■■ There is no general common-law duty for hospitals to accept and treat all individuals. Under EMTALA, however, any individual who suffers personal harm as a direct result of a hospital's violation of the statute may bring a private civil action for damages. 42 U.S.C. § 1395dd(d). While an EMTALA action usually will be brought in conjunction with a state statutory claim or common-law medical malpractice or negligence action arising out of the same events, it does not create a federal cause of action for malpractice. *See,*

mine whether or not an emergency medical condition (within the meaning of subsection (e)(1) of this section) exists.
(b) Necessary stabilizing treatment for emergency medical conditions and labor
(1) In general[:] If any individual ... comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either—
(A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or
(B) for transfer of the individual to another medical facility in accordance with subsection (c) of this section.
....
(c) Restricting transfers until individual stabilized

(1) Rule[:] If an individual at a hospital has an emergency medical condition which has not been stabilized (within the meaning of subsection (e)(3)(B) of this section), the hospital may not transfer the individual unless .... [considerations not applicable to this case.]

8. Hospitals that voluntarily participate in the Medicare or Medicaid programs and have effective provider agreements must comply with EMTALA. *In re Univ. Med. Ctr.,* 973 F.2d 1065, 1083 (3d Cir.1992). When medical personnel working for a hospital violate EMTALA, that hospital is subject to liability for those violations "[b]ecause hospitals can act and know things only vicariously through individuals." *Burditt v. HHS,* 934 F.2d 1362, 1374 (5th Cir.1991) (internal citation omitted).

e.g., *Summers v. Baptist Med. Ctr. Arkadelphia,* 91 F.3d 1132, 1137 (8th Cir.1996); *Brooks v. Md. Gen. Hosp., Inc.,* 996 F.2d 708, 710, 713 (4th Cir.1993) (stating that EMTALA "does not create liability for malpractice based upon breach of national or community standard of care"). Liability is determined independently of whether any deficiencies in the screening or treatment provided by the hospital may be actionable as negligence or malpractice, see *Summers,* 91 F.3d at 1137, as the statute was aimed at disparate patient treatment.

## IV. Outpatients Do Not Trigger EM-TALA Coverage

█ In analyzing an EMTALA claim, the Act does not stand alone. The Department of Health and Human Services' Centers for Medicare and Medicaid Services (CMS) promulgated a Federal Regulation, 42 C.F.R. § 489.24(a)-(b),[9] and Final Rule, 68 F.R. 53,222 (Sept. 9, 2003),[10] clarifying the reach of EMTALA. *See* Brian Kamoie, *EMTALA: Dedicating an Emergency Department Near You,* 37 J. Health L. 41, at 55–56 (2004) (explaining that because of confusion in the interpretation and application of EMTALA, CMS set up a "Regulatory Reform Task Force" to recommend clarifications to the statute). Generally, we defer to a government agency's administrative interpretation of a statute unless it is contrary to clear congressional intent. *See Chevron USA, Inc. v. Natural Res. Defense Council, Inc.,* 467 U.S. 837, 843 & n. 9, n. 11, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (noting that when an agency with the power to construe a statute has provided a construction, we defer to that interpretation if it is "permissible"); *see also Mercy Home Health v. Leavitt,*

436 F.3d 370, 378 (3d Cir.2006) (explaining the *Chevron* deference test). "The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Chevron,* 467 U.S. at 843 n. 11, 104 S.Ct. 2778. Where Congress expressly delegates to an agency the power to construe a statute, we review the agency's interpretation under the "arbitrary and capricious" standard; where the delegation is implicit, the agency's interpretation must be "reasonable." *Id.* at 843–44, 104 S.Ct. 2778.

CMS has the congressional authority to promulgate rules and regulations interpreting and implementing Medicare-related statutes such as EMTALA. *See generally* 42 U.S.C. §§ 1302, 1395hh; 5 U.S.C. § 551, *et seq.* Among the 2003 clarifications, the Regulation and Final Rule address where and when EMTALA applies. CMS solicited public comments and took into account a range of objections to the proposed Regulation, providing a lengthy discussion responding to the comments and its reasons for its interpretation in the Final Rule. The Regulation was not raised by the parties or the District Court. Nevertheless, it is instructive to answer the question before us: whether Mrs. Torretti fits within EMTALA's scope—a patient antidumping statute. CMS has concluded that EMTALA does not apply to patients (and outpatients), which interpretation precludes the Torrettis' EMTALA claim in the first instance because Mrs. Torretti was an outpatient who came to Paoli for a scheduled appointment.

**9.** Titled "Special responsibilities of Medicare hospitals in emergency cases."

**10.** Titled "Medicare Program; Clarifying Policies Related to the Responsibilities of Medicare–Participating Hospitals in Treating Individuals with Emergency Medical Conditions."

■ Turning to the Regulation's interpretation of the statute, EMTALA's requirements are triggered when an "individual comes to the emergency department." [11] 42 C.F.R. § 489.24(a)(1). [12] To parse out this clause, an "individual" only "comes to the emergency department" if that person is not already a "patient." *See id.* § 489.24(b); *see also* 68 F.R. at 53,238 (explaining that because "outpatients" "are patients of the hospital already, we believe it is inappropriate that they be considered to have 'come to the hospital' for purposes of EMTALA"). The Regulation defines "patient" for our purposes as "[a]n individual who has begun to receive outpatient services as part of an encounter, as defined in § 410.2 of this chapter, other than an encounter that the hospi-

11. *Cf. Lopez–Soto v. Hawayek*, 175 F.3d 170, 173–76 (1st Cir.1999) (explaining that subsections (a) (screening) and (b) (stablilization) of EMTALA should be read in the disjunctive because (a) uses the term "emergency department" and (b) uses the term "hospital," and concluding that transferring an infant born in the maternity ward with an emergent condition to another hospital with specialized care without stabilization would qualify as a claim under EMTALA). We note that this case came before CMS's 2003 clarifying Regulation and Final Rule. We do not attempt to speculate at how the First Circuit Court of Appeals would view this question in light of the revised Regulation, but in the Court's analysis it noted that the EMTALA "provisions create distinct obligations and apply to different classes of individuals." *Id.* at 175. We also note that a "labor and delivery department," where the baby in *Lopez–Soto* was born and transferred from, is considered to be a "dedicated emergency department" under the Regulation and Final Rule and thus falls under EMTALA, whereas Paoli's Perinatal Testing Center is for outpatient fetal monitoring and consulting only. *See* 68 F.R. at 53,- 229–30 (explaining that EMTALA coverage applies to "labor and delivery departments" because they "provide care for emergency medical conditions on an urgent, nonappointment basis").

As was the *Lopez–Soto* Court's focus, CMS pointed out that the nomenclature discrepancies in the statute have led to confusion and the uneven application of EMTALA. *See* 68 F.R. at 53,227–228; *see also* Kamoie, 37 J. Health L. at 46–47, 51–52. By focusing EMTALA obligations across methods of classification, such as by distinguishing between hospital patients and other individuals who come to the hospital, CMS attempted to clarify the statute. *See* 68 F.R. at 53,224 ("We proposed to clarify the extent to which EMTALA applies to inpatients and

outpatients. We believe these clarifications will enhance understanding for hospitals as to what their obligations are under EMTALA, so that they more clearly understand to whom they are obligated under this provision of the statute, and whose care will be governed by the Medicare hospital [conditions of participation].").

12. The pertinent part of subsection (a) of the Regulation states:

(a) Applicability of provisions of this section.

(1) In the case of a hospital that has an emergency department, if an individual (whether or not eligible for Medicare benefits and regardless of ability to pay) "comes to the emergency department," as defined in paragraph (b) of this section, the hospital must—

(i) Provide an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition exists. The examination must be conducted by an individual(s) who is determined qualified by hospital bylaws or rules and regulations and who meets the requirements of § 482.55 of this chapter concerning emergency services personnel and direction; and

(ii) If an emergency medical condition is determined to exist, provide any necessary stabilizing treatment, as defined in paragraph (d) of this section, or an appropriate transfer as defined in paragraph (e) of this section. If the hospital admits the individual as an inpatient for further treatment, the hospital's obligation under this section ends, as specified in paragraph (d)(2) of this section. 42 C.F.R. § 489.24(a).

tal is obligated by this section to provide."[13]   42 C.F.R. § 489.24(b).

CMS explains that EMTALA does not apply to outpatients, even if during an outpatient encounter "they are later found to have an emergency medical condition . . . [and] are transported to the hospital's dedicated emergency department."   68 F.R. at 53,240 (pertinent section titled "Applicability of EMTALA:  Individuals Present at an Area of the Hospital's Main Campus Other than the Dedicated Emergency Department" that corresponds with 42 C.F.R. § 489.24(b)); *see also id.* at 53,-243, 53,247 ("[W]e are . . . [a]dopting as final the proposed definition of patient . . . to reflect the nonapplicability of EMTALA to an individual who has begun to receive outpatient services at an encounter at the hospital other than an encounter that the hospital is obligated by EMTALA to provide.").  "These individuals are considered patients of the hospital and are protected by [Medicare's Conditions of Participation] and relevant State law," as well as "under general rules of ethics governing the medi-

cal profession."   *Id.* at 53,238–40[14];  *see also* Kamoie, 37 J. Health L. at 51–52.

The Torrettis argue that EMTALA is triggered because Mrs. Torretti came to Paoli for "what was, from the inception, a potential 'emergency medical condition' " because "EMTALA protects people who *present* 'for what may be an emergency medical condition.' " Appellants' Supp. Br. at 2 (quoting 68 F.R. 53,222) (emphasis added).   This is not supported in the record.   Mrs. Torretti came to Paoli for her scheduled bi-weekly appointment involving routine monitoring of her high-risk pregnancy and did not present as an emergency to the Paoli medical staff.[15]   In fact, she testified that, because of her complications throughout her third trimester, she did not believe she was in an emergent state until *after* she began the monitoring at Lankenau and her condition quickly changed.   Her other actions and testimony, as well as the testimony of her husband and the medical personnel, are consistent with this view.

---

**13.**  "Outpatient means a person who has not been admitted as an inpatient but who is registered on the hospital or CAH [critical access hospital] records as an outpatient and receives services (rather than supplies alone) directly from the hospital or CAH." 42 C.F.R. § 410.2.

**14.**  The pertinent part of the CMS Final Rule states:

EMTALA does not apply to any individual who, before the individual presents to the hospital for examination or treatment for an emergency medical condition, has begun to receive outpatient services as part of an encounter. . . . Such individuals would be included under this policy, regardless of whether or not they began the nonemergency encounter in order to keep a previously scheduled appointment or under orders of a physician or other medical practitioner. . . . [W]e believe it is inappropriate to consider such individuals, who are hospital outpatients who have protections under the

[Medicare Conditions of Participation], to have "come to the hospital" for purposes of EMTALA as well, even if they subsequently experience an emergency medical condition.

**15.**  We note, however, that EMTALA could be triggered in a circumstance where an individual comes to the hospital requesting treatment for an emergent condition, despite having a pre-scheduled appointment within the hospital for a related or unrelated reason. *See* 68 F.R. at 53,241; *id.* at 53,237 ("[I]f [an] individual [sent to a hospital for specific diagnostic tests] were to tell the hospital staff at the laboratory or radiology department that he or she needed emergency care, EMTALA would apply.").   As we discussed above, that is not the situation here and would require a different analysis.   There is a narrow exception where an individual need not request emergency care, but Mrs. Torretti also does not fit under this exception, and we do not discuss it in more detail.

Contrary to the Torrettis' contention on appeal, Mrs. Torretti's statements to Dr. Gerson near the beginning of the appointment (describing her discomfort due to her large size and her conversations with Dr. McConnell over the weekend) do not amount to presenting an emergency. At any medical appointment, we would expect medical personnel attending to a patient to request pertinent medical information, and, in turn, expect that a patient share such information concerning the perceived state of her health, which is precisely what Mrs. Torretti did in this case. This type of routine patient-doctor dialogue does not transform a pre-scheduled medical appointment into an emergent situation triggering EMTALA.

The Torrettis also imply that, regardless of whether Mrs. Torretti was a "patient," because she had a high-risk pregnancy, each scheduled visit to Paoli during her pregnancy would qualify as a presentment of an emergency medical condition to trigger EMTALA coverage. Appellants' Supp. Br. at 3 ("Mrs. Torretti came to [Paoli] for what was, from the inception, a potential 'emergency medical condition.' As the fetus of a woman who has been an insulin-dependent diabetic since infancy, her baby was at serious risk of stillbirth or fetal death.") (citation omitted). This is an unreasonable interpretation of the Act that broadens its scope beyond Congress's intent. To illustrate this point, individuals in equivalent situations to Mrs. Torretti would be hospital outpatients who have routinely scheduled weekly or monthly appointments to receive dialysis or chemotherapy for treatment of kidney disease and cancer, respectively. We believe it is clear that Congress did not intend EMTALA to cover these individuals every time they come to the hospital for their appointments, even though they suffer from serious medical conditions that risk becoming emergent.

Given this context, we believe CMS's more restrictive interpretation on this issue is consistent with EMTALA, and is in accord with the Act's intent. Congress passed EMTALA to curb the problem of patient dumping by creating a statutory duty for hospitals to examine and treat individuals who come to them for emergency care. 42 U.S.C. § 1395dd. Accordingly, this interpretation is entitled to *Chevron* deference. *See Chevron,* 467 U.S. at 843, 104 S.Ct. 2778; *see also Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 504, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982) (noting agency regulations interpreting a statute "will often suffice to clarify a standard with an otherwise uncertain scope").

One final note on this issue is that in supplemental briefing the Torrettis point to a Ninth Circuit Court case, *Arrington v. Wong,* 237 F.3d 1066, 1071–72 (9th Cir. 2001), and argue that CMS has taken an "expansive approach" to the phrase "comes to the emergency department," which triggers EMTALA. Appellants' Supp. Br. at 1. *Arrington* was issued prior to the 2003 Final Rule and revised Regulation that clarified the treatment of outpatients under the statute by revising the definition of "patient," which is the significant issue here. The "expansive approach" to which the *Arrington* court refers broadens the definition of the phrase "comes to the emergency department" to include other parts of the hospital, such as "hospital property-sidewalks," which is not determinative in this case. *See Arrington,* 237 F.3d at 1071–72 (addressing whether under EMTALA "hospitals must admit emergency patients who are being transported to the hospital in non-hospital owned ambulances," and noting that "[t]he [R]egulation answers this question"); *see also* 42 C.F.R. § 489.24(b) (explaining that if an individual is *not* a "patient," that individual "comes to the emergency department"

within the meaning of the statute under four circumstances).

In this circumstance, the Torrettis will have to pursue legal avenues other than EMTALA because the statute does not apply here. Moreover, claims of negligence or malpractice more accurately reflect the relief the Torrettis seek.

## V. Summary Judgment

■ Although we have concluded that Mrs. Torretti's circumstances are not those contemplated by EMTALA coverage, we would be remiss if we did not address the substance of the claim for future guidance. The Torrettis alleged a "stabilization" claim—that defendants violated EMTALA because they did not stabilize her emergency condition and inappropriately transferred her. Under this theory, EMTALA requires that Mrs. Torretti (1) had "an emergency medical condition; (2) the hospital actually knew of that condition; [and] (3) the patient was not stabilized before being transferred." *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 883 (4th Cir.1992). The District Court dismissed the claim on summary judgment because the Torrettis could not show that defendants had actual knowledge of an emergency medical condition. "The Act does not hold hospitals accountable for failing to stabilize conditions of which they are not aware, or even conditions of which they should have been aware." *Vickers v. Nash Gen. Hosp., Inc.*, 78 F.3d 139, 145 (4th Cir.1996) (citing *Baber*, 977 F.2d at 883) (indicating that "EMTALA would otherwise become coextensive with malpractice claims for negligent treatment").

As the District Court concluded, the requirement of actual knowledge is the key to this issue. We adopt this *mens rea* condition precedent, which conforms with all our sister circuit courts of appeals that have addressed this issue under EMTALA. *See, e.g., Vickers*, 78 F.3d at 141;

*Eberhardt v. City of Los Angeles*, 62 F.3d 1253, 1258 (9th Cir.1995); *Holcomb v. Monahan*, 30 F.3d 116, 117 (11th Cir. 1994); *Gatewood v. Washington Healthcare Corp.*, 933 F.2d 1037, 1041 (D.C.Cir. 1991); *Cleland v. Bronson Health Care Group, Inc.*, 917 F.2d 266, 271 (6th Cir. 1990); *see also* 42 U.S.C. § 1395dd(b)(1). When we discussed EMTALA at the outset, we indicated that it was not intended to create a federal malpractice statute or cover cases of hospital negligence. Thus, the actual knowledge element comports with Congress's intent in passing the Act.

The District Court concluded that the Torrettis' evidence was not sufficient to raise a disputed issue, and we agree with that conclusion. As we outlined above in the fact section, there is no evidence that any of the hospital staff at Paoli, and specifically Dr. Gerson, actually knew that Mrs. Torretti's condition was an emergency before directing her to Lankenau for further monitoring. The medical personnel at Paoli knew her pregnancy was high-risk because of her diabetic condition, which was indicated in her medical charts and the Paoli testing results from that day, and she had a recent history of treatment for pre-term labor and contractions similar to those exhibited at Paoli (and approximately three weeks prior to the May 23 appointment, medical personnel at Paoli sent her to *Lankenau* for further monitoring). She arrived for a routine appointment and did not present herself as an emergency patient, neither she nor Dr. McConnell believed her situation was emergent over the weekend preceding the Paoli appointment, she did not believe her condition was emergent until *after* she arrived at *Lankenau* and her condition changed quickly, Dr. Gerson did not indicate that he believed her condition was emergent (*e.g.*, before Mrs. Torretti left Paoli, he expressly stated to the contrary when asked about transporting her to

Lankenau in an ambulance and when he spoke to Dr. McConnell about further monitoring at Lankenau), none of the other hospital staff indicated her condition was emergent (*e.g.*, Mrs. Torretti's testimony conveys that the nurse at Paoli commented that Mrs. Torretti might deliver the baby sometime that day, but did not suggest it was imminent or the situation was an emergency), and the Torrettis' expert report is unreliable to the extent that it opines on the element of actual knowledge.[16] One of the Torrettis' experts, Dr. Steven A. Klein, a fetal medicine specialist, stated in his undated first report that Dr. Gerson "should have urgently sent her to the nearest OB facility (Paoli Hospital)" and "not to do so was below the standard of care." These statements opine only on malpractice or negligence and not the actual knowledge standard under EMTALA. Dr. Klein added in his second report, attached to the opposition to summary judgment, that he believed Dr. Gerson knew Mrs. Torretti's condition was emergent. He based this opinion on several facts contained in his two reports about Mrs. Torretti's condition while at Paoli. One of those facts—that "[M]rs. Torretti complained of NO fetal movements for 2 days"—is not supported in the record.

Mrs. Torretti testified that she complained of reduced, not absent, fetal movements over the weekend prior to the Paoli appointment, and was able to stir the baby when she called Dr. McConnell the second time. Dr. McConnell testified to this as well, and Mrs. Torretti's medical report from Paoli indicates the same. Thus, regardless how we view the ability of medical experts to opine on the element of actual knowledge of another, we need not answer that question because here Dr. Klein's reports are not sufficient to create a disputed issue of material fact.

\*　\*　\*　\*　\*　\*

In this context, we affirm the District Court's grant of summary judgment.

16. Mrs. Torretti's testimony that, near the end of her ultrasound, she heard Dr. Gerson state that "it had a score of two," is not enough to raise a disputed issue of material fact. She believed the number referred to her biophysical profile score, though she did not state any reasons for this belief. That profile measures the health of the baby using both an ultrasound and a non-stress test. The corresponding score ranges from 0, which is very problematic, to 10, which is the best score.

Dr. Gerson testified that he was not able to conduct a formal biophysical profile, but that the ultrasound showed

both gross body movements and limb movements, as well as [excess] fluid around the baby[, which] allowed me to come to the conclusion that the baby had a biophysical profile score of 6, which is a profile score

that allows one to draw a conclusion that delivery wasn't necessarily going to be imminent or need to be imminent and that it was appropriate for her to go to Lankenau. This number is corroborated in Mrs. Torretti's medical report, which states that the biophysical profile score is 6. It is also consistent with Dr. Gerson's actions in sending Mrs. Torretti to Lankenau for further monitoring. Moreover, the letter Dr. Gerson sent to Lankenau indicated that, based on her ultrasound, "the placenta was found in the Posterior position and noted to be grade 2." This information is consistent with the statement Mrs. Torretti overheard Dr. Gerson make during the ultrasound. As the District Court concluded, Mrs. Torretti's speculation alone, without more, is insufficient to survive summary judgment.